SPEED et al. v. TRANSAMERICA CORP.

FRIEDMAN et al. v. TRANSAMERICA CORP.

ZAHN et al. v. TRANSAMERICA CORP.

Civ. A. Nos. 430, 468, 490.

United States District Court
D. Delaware.

Aug. 8, 1951.

Subsequent Opinion Sept. 20, 1951.

See 100 F.Supp. 461.

Hugh M. Morris, Edwin D. Steel, Jr., and William S. Megonigal, Jr., Morris, Steel, Nichols & Arsht, all of Wilmington, Del., for defendant.

Daniel O. Hastings, Ayres J. Stockly and Thomas R. Hunt, Hastings, Stockly, Walz & Wise, all of Wilmington, Del., Arthur Frank and Claude L. Gonnet, Frank & Gonnet, of New York City, for plaintiffs, William S. Speed and Jack Friedman et al.

Roger S. Foster, Gen. Counsel, Milton P. Kroll, Asst. Gen. Counsel, and Alexander Cohen, amicus curiæ, all of Washington, D. C., for Securities and Exchange Commission.

William H. Foulk and Herbert L. Cobin, of Wilmington, Del., for interveners.

Samuel J. Levinson, Frank Weinstein and Robert Bernstein, all of New York City, and Samuel Handloff, of Wilmington, Del., for plaintiffs, Philip Zahn et al.

LEAHY, Chief Judge.

Speed v. Transamerica: CA 480.

Plaintiffs' amended complaint seeks damages from Transamerica Corporation for alleged fraud and deceit in the purchase from plaintiffs of certain shares of stock of Axton-Fisher Tobacco Company, pursuant to a written offer dated November 12, 1942.[1] Various phases of the litigation have already been reported in Geller v. Transamerica Corp., D.C.Del., 53 F.Supp. 625; Id., 63 F.Supp. 248, affirmed 3 Cir., 151 F.2d 534; Zahn v. Transamerica Corp., D.C.Del., 63 F.Supp 243, reversed 3 Cir., 162 F.2d 36, 172 A.L.R. 495; Friedman v. Transamerica Corp., D.C.Del., 63 F.Supp. 247; Id., 5 F.R.D. 115; Speed v. Transamerica Corp., D.C.Del., 5 F.R.D. 56; Id, D.C., 71 F.Supp. 457.[2]

Plaintiffs have sued defendant, Transamerica Corporation, for having purchased from them Class A and Class B stock of the Axton-Fisher Tobacco Company at $40 and $12 per share, respectively, pursuant to a written offer dated November 12, 1942, which Transamerica made to all minority stockholders. The complaint alleges at the time of the sale the true value of the Class A stock was more than $200 per share and such value of the Class B stock was in excess of $100 per share. Plaintiffs allege Transamerica deceived them into selling their shares in the manner hereinafter stated. Plaintiffs seek judgment in an amount equal to the difference between the sales price and the alleged true value. The action purports to be a class action on behalf of all Class A and Class B stockholders who accepted the offer.

The complaint alleges in accepting Transamerica's offer, plaintiffs determined the value of their shares in reliance upon the Axton-Fisher annual report for 1941 and its accompanying letter, which Transamerica had caused to be mailed to the Axton-Fisher stockholders. The 1941 report showed the average cost of Axton-Fisher tobacco inventory to be $7,516,970, and the accompanying letter showed a decline in sales and net income since 1938; whereas, the complaint alleges, at the time when plaintiffs sold their stock the Axton-Fisher tobacco inventory had a real value in excess of $17,000,000 and its earnings were improving.

The complaint further alleges that prior to the time when Transamerica made its offer, it had determined to purchase as many Class A and Class B shares as possible and thereafter to convert its Class A stock into Class B stock, to redeem the remaining Class A stock, and as a final step, to merge or dissolve Axton-Fisher, to the end it might capture for itself the increased but undisclosed value of the Axton-Fisher inventory, all of which Transamerica did. Under these circumstances, the complaint alleges, Transamerica was under a fiduciary duty as a majority stockholder to inform the minority stockholders the real value of the Axton-Fisher inventory was in excess of $17,000,000; that its earnings were improving; and that Transamerica had determined upon a plan which had as its ultimate objective the merger or dissolution of Axton-Fisher; and that if Transamerica had made known these facts to plaintiffs, they would not have sold their stock.

The complaint contains four counts. The first count alleges a common law action of fraud and deceit. The last three counts allege violations of the three sub-paragraphs of Rule X–10B–5 of the Securities and Exchange Commission. I previously dismissed count 1, 71 F.Supp. 457. However, that count is regenerated now on a motion of plaintiffs asking me to reconsider that particular decision at this time.

The second count, in which the SEC has asked to be joined as amicus, alleges a violation of that portion of the SEC's Rule X–10B–5 which provides as follows:

"It shall be unlawful for any person, directly or indirectly, by the use of any

1. In Appendix II will be found the dramatis personae which will identify persons appearing in the record of the case.

2. The Speed case, as well as the related cases discussed here, have received comment in 59 Yale Law Journal 1120; 36 Calif.L.Rev. 325; 46 Mich.L.Rev. 1061; 96 U. of Pa.L.Rev. 276; 61 Harv.L.Rev. 359.

means or instrumentality of interstate commerce, or of mails, or of any facility of any national securities exchange

"1) To employ any device, scheme, or artifice to defraud, * * * in connection with the purchase or sale of any security."

The third count alleges a violation of that portion of Rule X–10B–5 which reads as follows:

"It shall be unlawful; * * *

"3) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."

The fourth count alleges violation of that portion of Rule X–10B–5 which reads as follows:

"It shall be unlawful * * *

"2) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statement made, in the light of the circumstances under which they were made, not misleading or * * * in connection with the purchase or sale of any security."

The substance of counts 2 and 3 is, defendant, prior to November 12, 1942, determined upon a plan to acquire as many shares as possible of Class A and Class B stock of Axton-Fisher Tobacco Company at prices far below their value in fact. The first attack alleged was a letter sent to Axton-Fisher stockholders dated November 12, 1942,[3] which offered $40 for the A stock and $12 for the B stock, but the offer was conditioned upon the acceptance of at least 24,000 shares of the A stock and 18,000 shares of the B stock. The complaint charges defendant Transamerica, prior to November 12, 1942, planned to capture the Axton-Fisher Tobacco Company inventory by merging, dissolving or liquidating Axton-Fisher. In view of such plan, it is charged the letter of November 12, 1942 lacked information concerning the value of Axton-Fisher's inventory and its increased earnings and the non-disclosure of these matters by Trans-

3. The text of the letter is:

"Transamerica Corporation
Montgomery Street at Columbus Avenue
San Francisco, California
November 12, 1942

"To the Holders of
Class A and Class B Common Stock of the Axton-Fisher Tobacco Company:

"We hereby offer to purchase from the holders thereof, for cash, all shares of common stock of The Axton-Fisher Tobacco Company owned by them of record, or actually owned by them, at the close of business October 31, 1942, as to which valid acceptances (as determined by us) of this offer are received before the close of business on November 27, 1942, at the following prices:

"$40 per share for Class A common stock
$12 per share for Class B common stock

"It is a condition of this offer for Class A common stock that valid acceptances be received from the holders of not less than 24,000 shares of said stock or such lesser number as is acceptable to us and it is a condition of the offer for Class B common stock that valid acceptances be received from the holders of not less than 18,000 shares of such stock or such lesser number as is acceptable to us.

"Stockholders desiring to accept the offer should deliver their stock certificates with the enclosed form of Acceptance and Assignment (following carefully the procedure for signing set forth on the form) to Fidelity & Columbia Trust Company, 5th and Jefferson Streets, Louisville, Kentucky.

"Payment of the purchase price will be made promptly, after the requisite number of valid acceptances have been received, on clearance of the stock for transfer by the transfer agent thereof.

"If our offer does not become effective by the close of business on November 27, 1942, your stock certificates and form of Acceptance and Assignment will be returned to you by registered mail promptly thereafter, without expense to you.

"Any inquiries regarding the offer may be addressed to us. Additional forms of the Acceptance and Assignment may be obtained from us or Fidelity & Columbia Trust Company.

"Very truly yours,
Transamerica Corporation
/s/ W. L. Andrews
W. L. Andrews
Vice President and Treasurer."

america constitutes a violation of subparagraphs 1 and 3 of Rule X–10B–5.

Count 4 in the first amendment made no reference to any plan by Transamerica to merge, liquidate or dissolve Axton-Fisher. It was charged there Transamerica deceived plaintiffs by failing to disclose the value of Axton-Fisher's inventory and the increase in earnings; and Transamerica's non-disclosure of these facts constituted a violation of subparagraph 2 of Rule X–10B–5. In a later amendment, however, count 4 charged intent to liquidate. I think this indicates, as I shall explain more fully later, that intent to liquidate, etc., is the heart of the case under plaintiffs' own theory.

Before stating the respective arguments of the parties and the legal issue as it appears to me, it will be necessary to state the facts in almost monotonous detail. The chronological order of important events looks like this:

### 1941

May 14: (1) Transamerica purchased 80,610 shares of Axton-Fisher B stock, subject to certain options, for $1,000,000. Such purchase enabled defendant to exercise effective control of Axton-Fisher. (2) Through the offices of L. M. Giannini, Transamerica selected Carl B. Robbins to take charge of the operations of Axton-Fisher. Robbins' salary arrangement was agreed to initially by Transamerica.

May 24: Transamerica was responsible for the election of a new Board of Directors for Axton-Fisher.

October 22: Robbins reported to L. G. Hunt, a representative of Transamerica, that tobacco replacement value exceeded book value by 99.8%

December 19: Transamerica entered into an oral agreement with Axton-Fisher to purchase up to $1,000,000 of prior preferred stock to be issued under a plan to be submitted to the SEC.

### 1942

February 13: Axton-Fisher filed its plan of recapitalization at the San Francisco office of the SEC.

March 23: SEC issued a deficiency letter.

April 21: Transamerica drafted a letter to be submitted by Axton-Fisher with respect to the withdrawal of the plan.

May 4–6: Axton-Fisher requested withdrawal of the plan. SEC agreed to the withdrawal.

May 7–8: Withdrawal announced by Robbins; at same time announcement made that thereafter Transamerica would feel free to buy and sell Axton-Fisher stock.

May 22: Cullman, a former director of Axton-Fisher and an experienced man in the tobacco business, wrote a letter to Giannini suggesting that Axton-Fisher be liquidated.

May 27: Reply by Giannini, stating that he did not think that Transamerica would be interested in liquidation at that time, but suggested that any recommendation be submitted in concrete form.

May 28: (1) Robbins, advised of the Cullman letter, visited San Francisco and discussed liquidation with Giannini.

(2) Testimony of Robbins that the possibility of liquidation was so real that he procured an oral agreement that in such event Robbins would receive 5% of Transamerica's profit in lieu of his bonus contract with Axton-Fisher.

(3) Testimony of Robbins that Giannini offered him the presidency of Transamerica at $50,000 per year as a method of enabling Robbins to share in Transamerica's profits with the least tax burden.

June 16: (1) Giannini replied to a second letter of Cullman wherein a "concrete plan" was indicated, and suggested that Cullman contact Andrews, vice-president of Transamerica.

(2) Memorandum prepared by Giannini in which was stated:

(a) Cease recapitalization plans until the six months operating statement was available.

(b) Purchase A stock so as to eliminate Cullman as a factor.

(3) 2,000 B shares purchased by Transamerica.

June 22: Beginning of Transamerica's extended purchases of A shares.

July 1: Robbins forwarded a proposed option for 2,000 B shares held by Transamerica.

July 2: Letter from Andrews to Robbins requesting that nothing more be done on recapitalization until success of stock purchase program could be determined.

July 7: Reply to Andrews by Robbins, expressing hope that defendant's purchase program would be successful.

July 10–20: Six months operating statement received by Transamerica; operating loss before taxes and other income of $17,241.77.

August 29: Maximum Price Regulation for flue-cured tobacco.

August 31: (1) Robbins held conference with Giannini in San Francisco.

(2) Testimony of Robbins that inventory, taxes, and adverse government regulations relating to operating potential were discussed.

September 2: Option for 2,000 B shares given Robbins; $10 per share option price representing cost to Transamerica.

September 11: Report to Axton-Fisher Board by Robbins, expression of hope for solution to recapitalization.

September 18: Cullman's sale of his entire Axton-Fisher holdings (9,430 shares) at $47.50 per share. Robbins influential in negotiating transaction for Transamerica.

October 6: Independent auditors presented their report for first 8 months of 1942.

November 12: Letter from Transamerica to all Class A and Class B stockholders offering, under certain conditions, to buy A stock at $40 per share, B stock at $12 per share.

December 4: Maximum Price Regulation for Burley tobacco.

### 1943

January 8: Quotas imposed upon Burley tobacco; purchases limited to 90% of historical amounts.

January 14: (1) Visit by Robbins to San Francisco.

(2) Recommendation by Robbins that liquidation be effected.

(3) Offer by Giannini to initiate contacts with other tobacco companies.

February 25: Smith, an officer of the Bank of America, reported to Giannini a conversation with Robbins about the value of the tobacco and the amount Robbins hoped to get on a trade with the Big Five.

March 7: Transamerica paid $450,000 to Standard Commercial Tobacco Company, to release certain options on Transamerica's original share purchase.

March 16 to April 30: Conferences with Philip Morris about the disposition of Axton-Fisher. Conclusion reached that Philip Morris would only be interested in the inventory of Axton-Fisher.

March 29: Transamerica converted its A stock into B stock.

April 1: Memorandum prepared by Giannini regarding telephone conversation with Robbins about Robbins' 5% remuneration and state of Philip Morris negotiations.

April 8: Visit by Robbins to San Francisco to relate Philip Morris' proposal to purchase the inventory, and discussion on Robbins' 5% compensation.

April 28: Purchase by Transamerica of 493 B shares at $42.

April 30: At Transamerica's suggestion, Axton-Fisher resolution for redemption of A stock, notice of redemption mailed.

June 3–8: (1) Axman letter addressed to Axton-Fisher reminding Board of A stock liquidation rights.

(2) Admission by Robbins that Giannini had advocated liquidation as Axton-Fisher's sole prospect in February, 1943.

June 8: Letter from Dawson to Panario and Schimpff, Transamerica agents, recommending disclosure by Transamerica of A stock liquidation rights.

June 15: Axton-Fisher Board meeting; Director's purpose to rescind April 30 resolution of redemption put off until Transamerica representative could contact Giannini. Letter from Transamerica suggesting personal liability of Directors for rescission read to Board.

June 16: Board modification of April 30 resolution. Redemption became voluntary rather than mandatory.

June 28: Letters from Schimpff, Transamerica officer, to Axton-Fisher Directors and key officers, protesting rumor that Axton-Fisher was to be liquidated.

July 15: Decision of the Kentucky Court of Appeals that mandatory April 30 resolution was binding.

July 16: Complaint in Geller[4] case filed, alleging Transamerica had caused A stock redemption to reap profit by merger or liquidation.

July 31: Resignation of old Board and election of members suggested by Transamerica.

August 1: Election of Tapp, Vice-President and Finance Committee member of Transamerica, as President of Axton-Fisher.

August 9: Giannini memorandum suggesting proper price of B stock to be $120 per share.

November 5, 17, 19, 20 and 22: Conferences with Philip Morris about acquisition of Axton-Fisher.

November 25: Issuance of printed audit of Axton-Fisher for first ten months of 1943.

December 31: Decision in the Geller case holding for defendant.

### 1944

January 13, 19, 24, 28: Conferences with Philip Morris regarding acquisition of Axton-Fisher.

March 14: Conferences between Lybrand, Ross Bros. & Montgomery, auditors and Philip Morris representatives; aspects of dissolution discussed.

April 18: Storage agreement providing for warehousing of tobacco inventory.

April 27: Recommendation of liquidation by Andrews to Transamerica Board.

April 29: Axton-Fisher Board meeting; redemption of preferred stock.

May 25: Letter from Andrews to Axton-Fisher giving reasons for, and suggesting, liquidation.

May 31: Axton-Fisher Board resolution, approving dissolution.

This case turns, as the detail will show later, on the single question as to whether it is a proper inference from all the testimony that Transamerica intended prior to November 12, 1942, to merge, dissolve or liquidate Axton-Fisher. I now turn to a statement of the facts.

### The Facts

Transamerica is a large and powerful investment company which was dominated by the late A. P. Giannini, whose business acumen was said to be legendary. Axton-Fisher was a small tobacco company, the controlling shares of which were purchased by Transamerica for $1,000,000. Transamerica's initial interest in Axton-Fisher consisted in the purchase of 80,610 shares of Class B stock by Capital Company, a wholly owned subsidiary of Transamerica. These shares were acquired from Standard Commercial Tobacco Company pursuant to an agreement dated March 21, 1941, between Capital Company, Standard Commercial Tobacco Company, and John M. Harlan, its Trustee under Section 77B of the Bankruptcy Act, 11 U.S.C.A. § 207. Subsequently, Capital Company assigned its interest in the contract to Transamerica.

At the time when Transamerica acquired the 80,610 shares of Class B stock of Axton-Fisher, the latter company had issued and outstanding 14,136 shares of Preferred stock entitled to preferential cumulative dividends of $6 per share per year, and entitled on redemption or liquidation to $105 per share; 45,465 shares of Class A stock entitled to cumulative dividends of $3.20 per share after the payment of dividends on the preferred stock; and in addition, after the Class B stock received $1.60 per share in any given year, the Class A stock was entitled to participate as a class equally with the Class B stock as a class in the

4. See Geller v. Transamerica Corp., supra.

distribution of further dividends. Upon dissolution, liquidation, merger or consolidation or a sale of substantially all of the Axton-Fisher assets, the Class A stock was entitled to receive all unpaid accrued dividends and, in addition, $2 per share for each $1 per share paid upon the Class B stock. The Class A stock was redeemable at $60 per share plus accrued dividends, and was convertible into Class B stock, share for share, at the holders' option at any time prior to the redemption date; 112,012 shares of Class B stock, subject to the preferential rights of the Preferred stock and Class A stock.

Dividend defaults had existed on the Preferred stock and the Class A stock since 1937. As a result, the shares of each of these classes had equal voting rights with the Class B stock under the Charter.

The contract of March 21, 1941, was negotiated by L. M. Giannini, who was a director but not an officer of Transamerica. While he was in Washington on other business, persons interested in Standard Commercial Tobacco Company approached him as President of the Bank of America with a view to obtaining a loan for Standard Commercial Tobacco Company.[5] Giannini recognized that the loan would not be a bankable transaction, but he thought the Axton-Fisher situation was one that had possibilities from Transamerica's standpoint. Giannini reported his views to Grant, the President of Transamerica. At Grant's request, Giannini carried forward the negotiations as Transamerica's special representative. Grant died on March 25, 1941. After Transamerica acquired its interest in Axton-Fisher, W. L. Andrews, Vice-President and Treasurer of Transamerica, was the corporate officer who was actively in charge of the Axton-Fisher investment.

In the study which Giannini made of Axton-Fisher, he concluded that the deal would be of no interest unless the capital structure of Axton-Fisher could be revamped through a recapitalization. Giannini recognized that at some stage, equity money should be put into the company for purposes of expansion but that the Class A stock was restrictive of future financing. This was because under the terms of the charter, the Class A stock as a class was entitled to participate equally with the Class B stock as a class in the company's dividends. Because of this extraordinary provision the Class A stock stood to receive one-half of the dividends resulting from any additional investment in the Class B stock.

Consequently, before Transamerica purchased the Class B stock, it employed a Mr. Hunt to work out a plan of recapitalization which would be acceptable to Axton-Fisher and its stockholders. The plan as originally developed, contemplated the issuance of debentures in exchange for the Preferred and Class A stock. Transamerica had Hunt go to Louisville to discuss this plan with the Axton-Fisher directors. After receiving their tentative approval, Giannini took the plan up with the officers of Transamerica, who authorized him to proceed with the negotiations. It was only after assurances had been received from the Axton-Fisher directors that the plan developed by Hunt was acceptable, that Transamerica became interested in acquiring the Class B stock.

When the purchase of stock was under consideration, Giannini talked to Robbins, who was President of Commodity Credit Corporation, about the possibility of taking a position with Axton-Fisher, if Transamerica purchased its stock. Later, Giannini arranged for Robbins to meet the directors of Axton-Fisher. After Transamerica had acquired its Class B stock, Robbins was employed by the directors. In June of 1941, Robbins became Chairman of the Board, and in September of 1941, Robbins became President of the Company.

The recapitalization involving the issuance of debentures, which the directors had tentatively approved prior to Transamerica's acquiring its shares, became the subject of active consideration immediately after Transamerica purchased its stock,

5. The Bank of America had no interest in Transamerica but Transamerica had a minority stock interest in Bank of America.

and the debenture plan was revised several times during the summer and early fall. On at least two occasions, Cullman, one of Axton-Fisher's directors, expressed opposition to the debenture plan.

On January 6, 1942, the directors of Axton-Fisher authorized the preparation of a registration statement providing for the issuance of a new 5% cumulative Prior Preferred stock to be offered in exchange for the 6% Preferred stock and Class A stock upon the basis stated in the resolution. Cullman was the only director who voted against this plan. This latter plan was modified in some particulars at the directors' meeting held on February 10, 1942.

On February 11, 1942, Transamerica entered into a written contract with Axton-Fisher which obligated Transamerica to underwrite approximately $1,000,000 par value of the Prior Preferred stock to be issued under the plan, provided that prior to April 10, 1942, Axton-Fisher amended its charter so as to authorize the issuance of the Prior Preferred stock. This written contract was an effectuation of an earlier verbal commitment which Andrews made with Robbins on December 19, 1941. Cullman was opposed to this plan and on

February 26, 1942, he resigned as a director of Axton-Fisher.

The Preferred stock plan was set forth in a registration statement which Axton-Fisher filed with the SEC on February 13, 1942. In the normal course of events, the registration statement would have become effective on March 5th, § 8(a), Securities Act of 1933, 15 U.S.C.A. § 77h (a). In the interim, however, the SEC held a hearing on the registration statement, and on March 23, 1942, the SEC issued its customary deficiency statement with respect to the registration statement.[6] Since under the Axton-Fisher By-Laws twenty days' notice of a stockholders' meeting was required, the issuance of the deficiency notice on March 23rd made it impossible to clear up the deficiencies in sufficient time to permit the calling of a stockholders' meeting by April 10th. Hence, Transamerica's obligation under its underwriting agreement expired on that date; Transamerica advised Axton-Fisher that it was unwilling to extend its commitment.

On May 4, 1942, Axton-Fisher wrote the SEC and requested its consent to the withdrawal of the registration statement.

5. The inquiries contained in the deficiency letter were never answered because on May 4, 1942, Axton-Fisher wrote the Commission and requested and received consent to withdraw the registration statement. It is of some importance, however, that the SEC did not find the method Axton-Fisher used to carry its inventory deficient. At least one author agrees the SEC rules do not require inventory to be priced at market value. Consequently, that author agrees that inventory may be stated to be at cost or market value whichever is lower. See Prospects for Rule X–10B–5: An Emerging Remedy for Defrauded Investors, 59 Yale Law Journal 1120 at 1157. The writer suggests the SEC's Regulation S–X ought to be revised so as to compel disclosure of the current market value of inventory as well as cost in all financial reports filed with the Commission. This, however, may be said to overlook Rule 3–06 of the Regulation. At oral argument, SEC counsel pointed out that material facts not revealed by accepted accounting practices are required to be disclosed under the Rule.

It does not appear that any person

from Transamerica testified at the Commission hearing, and in spite of Robbins' assurances as to the intentions of Transamerica, the Commission nevertheless submitted the deficiency letter under date of March 23, 1942. It is not difficult for one to draw one's own conclusions from what was requested, in part, by this deficiency letter. The SEC letter stated:

"In order that the prospectus may not omit to state material facts necessary to make the statement contained therein not misleading, the prospectus should include information in respect of the following:

"(3) a tabulation on the basis of book value showing liquidating value of the Class 'A' stock to be surrendered.

"*General* A letter should be submitted as supplemental information stating the intentions so far as known by the registrant with regard to the holding or liquidation of any of the 5% prior preferred shares which Transamerica Corporation may acquire under its purchase agreement with the registrant or otherwise *and with respect to the holding or disposition of the Class 'B' common shares now owned by that company.*" (Emphasis supplied.)

On May 7, 1942, Axton-Fisher issued a press release announcing the abandonment of the Preferred stock plan. The announcement stated that Transamerica had advised Axton-Fisher that it (Transamerica): "will feel free to buy or sell or otherwise trade in the various issues of the company's outstanding securities if its judgment should in the future dictate such action." On May 22, 1942, Cullman, the director who had opposed all recapitalization plans, wrote Giannini and urged that Axton-Fisher be liquidated. On May 27, 1942, Giannini replied saying he doubted whether this would meet with Transamerica's approval, but if Cullman had anything definite in mind, it would receive consideration.

*On May 28, 1942, Robbins arrived in San Francisco to confer with Giannini. What was said between Giannini and Robbins during these conferences is one of the fact issues about which the parties are in sharp dispute.*

Shortly after the withdrawal of the Preferred stock plan from the SEC, Robbins and Andrews began to work upon another plan of recapitalization. By June 12, 1942, a plan had been developed for the exchange of one share of Prior Preferred stock plus cash for each outstanding share of 6% Preferred stock, and an exchange of two shares of Class B stock plus cash for each outstanding share of Class A stock. This plan, like the Preferred stock plan, required an amendment to the Axton-Fisher Charter. The question therefore arose whether it would be possible to get the necessary vote of ⅔ of the Class A stock to put through the Charter amendment. Defendant contends that then Transamerica decided to begin the acquisition of Class A stock so as to have some assurance that the plan would succeed. Prior to this time Transamerica had purchased no Class A stock. After June 16th however, Andrews arranged with the brokerage firm of Merrill-Lynch to offer Transamerica any Class A stock that might come on the market.

Between June 22, 1942 and September 10, 1942, Transamerica bought 6,842 shares of Class A stock; and on September 18th and 22d, 1942, Transamerica purchased 9,430 shares of Class A stock from Cullman and associates. These were the only shares of Class A stock purchased by Transamerica prior to making its offer of November 12, 1942. However, the purchases gave Transamerica more than a ten percent (10%) interest in the Class A stock, and therefore it made monthly reports of its purchases to the SEC.

In the meantime, in the latter part of August, 1942, Robbins was in San Francisco and again saw Giannini. What took place at this meeting is discussed infra. At this point it is sufficient to note Robbins and Giannini have sharply disagreed in their testimony.

On November 12, 1942, Transamerica made its offer to purchase Class A stock at $40 per share and Class B stock at $12 per share. Pursuant to this offer, Transamerica acquired 13,536 shares of Class A stock and 5,707 shares of Class B stock.

In January of 1943, Robbins again saw Giannini in San Francisco. Robbins testified that in January the OPA had placed a ceiling price on Burley tobacco, and he advised Giannini that it seemed advisable for Axton-Fisher to realize upon the appreciation in its tobacco inventory. Giannini testified that he did not agree with Robbins, but told him that in view of his strong feeling in the matter, he should see what could be done and submit his proposal to Transamerica on the basis of specific facts.

On March 29, 1943, Transamerica converted the 30,068 shares of Class A stock which it then owned, into a like number of shares of Class B stock in accordance with the conversion privilege conferred upon Class A stockholders by the Axton-Fisher Charter.

On April 30, 1943, Axton-Fisher called for redemption on July 1, 1943 the remaining Class A stock at $80.80 per share, the redemption price fixed by the Charter. At the same time the directors declared a dividend of $26.25 per share upon the Preferred stock for the purpose of paying the accrued dividends in full. Prior to the resolution of redemption being adopted by the Axton-Fisher directors, Transamerica, through

its attorney, had advised Axton-Fisher that in its opinion the Class A stockholders were entitled to convert their shares up until the redemption date fixed in the redemption resolution.

The net effect of Transamerica's conversion of its Class A stock into Class B stock, the redemption of the remaining shares of Class A stock, and the payment of the dividend arrearages upon the Preferred stock was to give Axton-Fisher a capital structure consisting solely of 6% Preferred stock and Common stock. In addition, all dividend arrearages on the 6% Preferred stock were paid in full. In short, the capital structure was simplified and the Class A stock completely eliminated.

Robbins told Judge Dawson that in February of 1943 Giannini had concluded that Axton-Fisher should be liquidated. Dawson said that this statement by Robbins was the reason that the directors passed the resolution of June 16th which attempted to make the redemption of the Class A stock optional with the stockholders instead of mandatory. Robbins' statement to Dawson that in February Giannini had concluded that Axton-Fisher was to be liquidated, conflicts with Robbins' testimony in this case.

When Robbins threatened to quit Axton-Fisher, Transamerica sent Panario and Schimpff to Louisville on its behalf in June of 1943. Both of these persons told Judge Dawson that Transamerica did not contemplate liquidating Axton-Fisher. Furthermore, Transamerica gave Judge Dawson its written assurance it was not contemplating any dissolution, liquidation, merger, or consolidation, or a sale of substantially all of the assets of Axton-Fisher. Nevertheless, the directors of Axton-Fisher adopted the resolution of June 16, 1943 which attempted to rescind the mandatory redemption resolution of April 30th, and to make the redemption optional with the Class A stockholders.

On July 16th the Court of Appeals of Kentucky held in Taylor v. Axton-Fisher Tobacco Company, 1943, 295 Ky. 226, 173 S.W.2d 377, 148 A.L.R. 834, that the resolution of June 16th was invalid and that the resolution of April 30th was binding on all Class A stockholders.

On May 31, 1944, Axton-Fisher was dissolved, and on June 20, 1944, it entered into a contract with Philip Morris under which it agreed to sell to Philip Morris, all of its real estate, machinery, equipment, furniture, fixtures, supplies, brands, trademarks, trade names, and some 8,710,000 pounds of tobacco for an aggregate consideration of $8,925,000. Shortly thereafter, Axton-Fisher paid a liquidating dividend to its stockholders, consisting of warehouse receipts for tobacco. This was supplemented in December of 1944 by a cash liquidating dividend of $7.50 per share, and in September, 1946, by an additional cash liquidating dividend of $1.50 per share.

1. It is not important to name the precise liquidation value of the Class A and Class B shares at the time of the November 12, 1942 letter. It is sufficient here to state that the value in each instance would have been substantially in excess of the offering price.

It is a fact that the letter of November 12, 1942 made no statement as to the earning position of Axton-Fisher and made no mention of the obviously greatly increased value of the tobacco leaf inventory. The matters which I have thus far detailed were undisputed. Before discussing the inferences which I shall draw from other facts and before discussing the testimony which I accept in cases where there is dispute, I shall pause to state the contentions of the parties.

Stated broadly, plaintiffs contend that the evidence shows that at the time of its offer of November 12, 1942 Transamerica planned to cause a liquidation, merger, consolidation, etc., of Axton-Fisher and that this, plus the non-disclosure of Axton-Fisher's much increased earnings and its greatly increased tobacco inventory, constituted a violation of Rule X–10B–5 of the Securities and Exchange Commission and that consequently defendant is liable to these plaintiffs in damages. Plaintiffs further contend that defendant violated the provisions of the Securities and Exchange Act even absent a plan to liqui-

date, etc. They claim that the letter of November 12, even under such circumstances, failed to make adequate disclosure within the meaning of Rule X–10B–5. On the other hand, defendant's position, also stated broadly, is that the evidence does not justify the inference that there was any determination on Transamerica's part prior to November 12, 1942, to capture the Axton-Fisher inventory by merging, dissolving or liquidating Axton-Fisher and, even if such proof is present, plaintiffs cannot recover unless they also prove (1) they sold their stock in reliance on the stockholders' report of 1941 and (2) because of lack of information concerning the value of Axton-Fisher's inventory and its increased earnings. In addition, the parties disagree as to whether the complaint states a proper class action upon the assumption that a good cause of action is stated.

The issue, as I see it, is slightly different from the way the parties perceive it. I think the single issue here is whether Transamerica at the time it sent the letter of November 12, 1942 planned to capture the Axton-Fisher inventory by merging, dissolving, or liquidating Axton-Fisher. I think the other arguments by the parties (such as increased value of inventory, fair price, etc.) are dependent upon the proper answer to this single inquiry and are not arguments of independent significance. If there was such a plan, failure to make disclosures in the letter of November 12, 1942, would be most significant and constitute a violation of the mentioned subsections of Rule X–10B–5 of the SEC.

Before considering the lengthy evidence, I want at this time to commend all the attorneys, including the SEC who appeared as amicus curiae, for the excellence of their arguments and briefs.[7] But this very excellence made my task more difficult.

The testimony and the proper inferences to be drawn from it are first considerations. This treatment of the tes-

timony will necessarily be repetitious because the subject matter of the disputed testimony and the subject matter of undisputed facts often coincide and overlap. I shall intersperse through this discussion of the evidence a consideration of the applicable legal principles.

■■ The single inquiry, then is, did Transamerica plan to capture the Axton-Fisher inventory by merging, dissolving, or liquidating Axton-Fisher at the time it sent its letter of November 12, 1942. There is little direct evidence to support plaintiffs' charge of such plan. The only direct evidence is, indeed, to the contrary, e. g., the testimony of Giannini that there was no such plan contemplated prior to November 12, 1942. Plaintiffs, however, ask me to find Transamerica had such a plan, purely as a matter of inference, and based primarily on the testimony of Robbins. They claim the direct evidence of defendant is not only unworthy of credence but the only reasonable inference from all the testimony is Transamerica had such a plan at the time it mailed its letter of November 12, 1942. Such inference—that there was such a plan— must be based on the state of mind of Giannini and the Axton-Fisher directors. To ascertain the state of mind of any witness in the case at bar at a particular point in time, I think it plain one must consider facts for a period, for example, both prior and subsequent to November 12, 1942. Behavior rather than words among men and women is most significant in ascertaining intent. Attorney General v. Drummond, 1 Drury & Warren 353, 368 (Lord Chancellor Sugden, "Tell me what you have done under such a deed, and I will tell you what that deed means".). Although the parties are in dispute, I accept the thesis plaintiffs must show there was a pre-existing intent to liquidate, etc., at the time of the November 12 letter by a preponderance of the probabilities.

An important part of plaintiffs' case is built around Robbins' testimony. His dep-

---

7. There were 23 briefs filed in these related cases, amounting to 1562 pages. The written record of oral testimony,

depositions and exhibits reached heavy proportions.

osition was taken by plaintiffs on three occasions. These will be considered separately, but the main point emphasized in Robbins' testimony is that in May 1942 Giannini discussed with him the liquidation of Axton-Fisher and at the same time agreed Robbins should be paid 5% of any profit Transamerica might make as a result of its stock ownership. In considering the credibility to be accorded Robbins' testimony, I am not unmindful plaintiffs found it necessary to take his deposition on three separate occasions. I do not think, however, this greatly affects Robbins' credibility because with one exception (this exception deals with the obvious misstatement by Robbins as to the time in 1942 he visited and discussed the liquidation with Giannini in California) the deficiency in his deposition was the fault of plaintiffs' counsel rather than of Robbins.

2. (a) *Robbins' First Deposition.* At the time of the first deposition, Robbins testified in the middle of 1942 Giannini discussed with him the best way of realizing the increased value of Axton-Fisher inventory. Robbins stated this conference made an impression upon him because it was during this conference he obtained Giannini's consent to a change in his (Robbins') employment contract. Under his existing arrangement with Axton-Fisher, Robbins was entitled to 5% of Axton-Fisher profits above a specified historical average. Under the revision which Robbins said Giannini agreed to in "midsummer of 1942" Robbins became entitled to 5% of any profits which Transamerica might make as a result of its stock ownership.

True Robbins stated it was his understanding from this conversation Giannini desired him to continue with the operation of Axton-Fisher as though operation of the company was a permanent thing. Robbins did, in fact, so continue the operation of Axton-Fisher as is evidenced, for example, by continued radio advertising of a fairly new brand of cigarettes

called "Fleetwood". Robbins also stated Transamerica had arrived at no express decision, so far as he was informed,[8] in the summer of 1942 to dispose of Axton-Fisher. Following Robbins' deposition, plaintiffs examined Giannini and Andrews. It appeared from this examination that on May 22, 1942, Cullman had written Giannini suggesting Axton-Fisher be liquidated. The testimony indicated Robbins was in San Francisco for the conference with Giannini some time subsequent to the time when Cullman's letter was received. This conclusion is enforced by testimony Robbins had seen a copy of Cullman's letter prior to departing for San Francisco and en route had prepared a draft of reply for Giannini to make to Cullman. The content of this letter indicates that at this time (i. e., en route to San Francisco) Robbins was unsympathetic to liquidation and his interests and energies were being concentrated on making Axton-Fisher a successful company.

I am unable to accept defendant's analysis of this testimony. I agree while on the train Robbins was unsympathetic to liquidation and at that time wished to concentrate his interests and energies in making Axton-Fisher a successful operating company. But, looking at the record as a whole, it is abundantly clear it was Giannini and not Robbins who made the decisions. I think a necessary inference is, while this was Robbins' opinion and desire, it was not what Giannini wanted. He had a strong urge to capture the huge tobacco inventory with its high and increased value. This conclusion is enforced by the circumstance a change in the method of compensating Robbins was discussed. I appreciate that at a later date Giannini stated Robbins' understanding of the agreement was not in accordance with his; but there is no dispute a changed method of compensation was discussed at some time, and such an agreement was related in some way, at least, to the value

---

8. I think it abundantly clear from the testimony as a whole Giannini never informed Robbins fully as to what his (Giannini's) real plans were. The evidence persuades me he told Robbins only so much as was essential to carry out Giannini's ambitious plans.

of Transamerica's investment in the Axton-Fisher stock.

(b) *Robbins' Second Deposition.* During Robbins' second deposition he fixed the date of his conferences with Giannini as in late August of 1942. He testified he conferred with Giannini in San Francisco and gave him a detailed inventory of Axton-Fisher's leaf tobacco, which showed flue-cured tobacco valued at OPA prices and the burley tobacco at market prices. The reason for the two standards for prices was the maximum price regulation for Burley tobacco did not go into effect until December 4, 1942. Robbins stated he told Giannini the federal taxes then in effect, placed a great pressure on corporations owning inventory which had appreciated. His view was for liquidation, thereby capturing the inventory profit subject only to a 25% capital gains tax, rather than undertake to capture the profit through operations, which profits were subject to the 90% excess profits tax. Robbins then testified, as he did in the first deposition, there was no decision at that time as to whether to liquidate which he was advised about. He also testified, as he did before, he told Giannini there would be disadvantage to the company should it cease advertising and selling new products and consequently give notice to the tobacco industry the company was planning to liquidate. After making this statement, Giannini instructed him to carry on for the time being as usual. In this second deposition Robbins reiterated the fact liquidation was such a predominant possibility he asked to have a change in bonus arrangement. Robbins testified further that one of the important reasons for the trip was to discuss inventory values and stated he had a fiscal inventory prepared before going to San Francisco. He stated Giannini seemed to be "quite happy about the possibility of capturing the great inventory profit through liquidation" and that Giannini indicated that liquidation "was an imminent possibility".

Defendant shows, I think, the conference did not take place in August or September but rather at a prior time. Defendant also shows that at this conference, whatever the time may be, Giannini's recollection was the bonus option was not discussed. Defendant attaches much more significance to Robbins' mistake in the time of the conference than I do. Moreover, I do not think Giannini's recollection (And he was not sure of it) on the bonus matter outweighs Robbins' direct testimony because only after the huge profit was realized did Giannini say that his understanding of the bonus agreement was far different from Robbins. In view of the great difference in the bargaining power of Giannini and Robbins and because of the controlling importance such a matter would be personally to Robbins, and because of his unequivocal testimony on the subject at the time of the first deposition, I accept Robbins' statement that the method of bonus payment was discussed at a meeting some time in the summer of 1942. Accordingly, I do not think Robbins' second deposition, as such, affects his credibility to any significant extent.

(c) *Robbins' Third Deposition.* During his third deposition Robbins said it was quite evident to him, at that time, he had not dined with the Gianninis in late August or early September (as he stated in his second deposition) but that the dinner party had taken place in May 1942. It was at that time, Robbins said, Giannini agreed to the new method of bonus payment and offered him the presidency of Transamerica. According to Robbins, Giannini told Robbins he would have a large sum of money coming to him and it would be taxable as ordinary income. He suggested, according to Robbins, it might be advantageous from a tax standpoint to work the amount out as president of Transamerica so that the payments could be spread over a period of time. Robbins stated he objected to this because in effect he would be working twice for the same money.

It appears that on July 1, 1942, Robbins wrote Giannini from Louisville and enclosed a draft of an option under which Robbins was given the right at any time prior to August 1, 1945, to purchase 2,000 shares of Class B stock belonging to Transamerica *at $10 per share,* with interest at 3% from August 1, 1942, and in his letter Robbins said: "I hope that the enclosures

will effectuate *what you have in mind which is very much appreciated * * *"*. Defendant argues from this that the existence of this agreement indicates there was no other agreement relative to 5% of any profit Transamerica might take out of its investment.

I have examined this August 1 memorandum far differently than defendant does. I think it is most significant. Even if it be assumed it weakens the existence of the 5% bonus arrangement testified to by Robbins, it still is of controlling importance in showing that Robbins was worrying about his "future" and method of compensation. Robbins, in view of his personal historical earnings record, was receiving handsome compensation. I think it a fair and perhaps inescapable inference the reason for the request for other methods of compensation was the realization by Robbins that, in a short but uncertain future time, he would be losing his good paying position. This inference is aided by the circumstance that the demands of Robbins did not take place until after the conference with Giannini in 1942. Though Robbins was so much against liquidation or merger that he prepared a memorandum on the train for Giannini to use as an answer to Cullman's proposal, it is nevertheless obvious Giannini did not accept Robbins' advice. In fact, Robbins stated every time he came away from a meeting it was with the impression that liquidation was a distinct possibility.

Moreover, the August 1 memorandum is important for added reasons. It supports Robbins' contention a change in compensation was discussed at the May meeting and that Giannini's statement relative to the taxability of the compensation payment caused Robbins to seriously ponder the best ways taxwise for the compensation to be paid. Robbins testified Giannini suggested Robbins take it out as president of Transamerica because of the great tax disadvantage of a lump sum payment. Consequently, I think the reason for the option agreement was Robbins had given some thought to the tax situation and decided this would be the way to capture part of the profit resulting from the liquidation in the most advantageous tax way possible.

Defendant also attaches importance to the failure of Robbins to make any memorandum of his agreement with Giannini and from his statement that he does not propose to attempt to collect it even though, under the alleged agreement, he, Robbins, is entitled to approximately $450,000. I am unable to attach the significance to these "facts" which defendant does. It is apparent from all the dealings with Giannini that he was a person of domineering personality and he would not have countenanced a request by an underling that he put his word in writing. From Robbins' statement that he does not propose to collect the money I certainly attach no significance adverse to plaintiffs. If the agreement was oral, his chances of obtaining a judgment are negligible. There is a further problem of the statute of limitations. But more than this, this argument of defendant, I think, cuts against it. If Robbins now has no hope of collecting some $450,000 which he claims due him as compensation, it seems obvious he has that much less reason to tell anything but the truth. On the other hand, Giannini (at least at the time the depositions were taken) had a very strong interest in the outcome of this litigation.

The above conclusion is enforced, I think, by a circumstance which defendant nevertheless thinks favors it. Giannini states it was not until Robbins' visit to San Francisco in April, 1943, that Robbins discussed with him, for the first time, the possibility of obtaining a 5% participation in any profit Transamerica might make on its Axton-Fisher inventory. According to Giannini, on March 31, 1943, Robbins spoke to him on the telephone about the negotiations which were going on with Philip Morris looking to a sale of the Axton-Fisher stock. Giannini stated at this time Robbins proposed that he be permitted to buy five per cent. of the Axton-Fisher stock owned by Transamerica at its average cost. After this telephone conversation, Giannini sent the following telegram to Robbins: "On thinking over your telephone conversation it is my fixed opinion that you should come out here promptly stop there must be no question about this matter regards Mario Giannini." Subsequently, about the middle

of April, Robbins went to California and at that time Giannini told him his request of 5% participation in Transamerica stock was preposterous. Plaintiffs argue that unless there had been a prior understanding between Robbins and Giannini, Giannini would have turned down the proposal which Robbins made on March 31 instead of making what was apparently a counter-offer. Plaintiffs also urge that unless there had been a prior understanding between Robbins and Giannini there would have been no reason for Giannini to request Robbins to come to the coast for further discussion. It is hardly credible from the evidence as a whole that Giannini would have requested Robbins to come to the coast for discussion if there had not been at least a prior understanding between them. Again, it is important to remember the respective positions of Giannini and Robbins. Giannini was a domineering personality. Robbins must supplicate. He could never demand. Moreover, since Axton-Fisher has ceased to exist and since Robbins has stated that he does not propose to try to recover the bonus payment which he claimed was due him, these facts persuade me that his testimony is entitled to great weight. In making this statement I am not unmindful of the numerous inaccuracies and even inconsistencies in the testimony of Robbins. But the inconsistencies are in minor matters after a lapse of a substantial period of time. It must also be remembered the testimony of Robbins must be considered vis-a-vis that of Giannini, who had a vital interest in the outcome of this litigation. I am not impressed by defendant's argument plaintiffs' case is weak because it relies almost entirely upon Robbins' conversation with Giannini and the mere fact that Giannini personally might have concluded it was to Transamerica's interest to liquidate Axton-Fisher does not prove that Transamerica reached such a conclusion.

Such a contention is at war with the reality of how a banker's mind works.

From the testimony as a whole, it is palpable so far as decisions were concerned Transamerica as well as Axton-Fisher were dominated by Giannini. When an important matter arose affecting Ax-

ton-Fisher and Transamerica, both Robbins and Cullman did not go to either board of directors but discussed the matter personally and privately with Giannini, *at Giannini's home*. Plaintiffs succeeded in proving (and this will be discussed more fully later) that Giannini planned to liquidate Axton-Fisher to capture the inventory profits before November 12, 1942; and this leaves me with the only realistic inference that can be drawn —that Transamerica had a similar intent. I conclude the specific treatment of the Robbins depositions and related matters. I shall refer to them again generally after I discuss the other evidence bearing on intent as of November 12, 1942.

3. I shall now consider more specifically the letter of November 12, 1942. It will be observed no information relative to the operations of Axton-Fisher was given the minority stockholders. The letter did provide: "Any inquiries regarding the offer may be addressed to us." Concededly, at the time the letter was mailed, the operating position of Axton-Fisher had vastly improved. This fact was well known to the directors of the company and consequently to Transamerica. But, if Transamerica did not at that time intend to liquidate, etc., Axton-Fisher and capture the inventory profit, I think it would specifically have advised the stockholders as fully as possible. It would not have sought to make the stockholders "dig" the information for themselves by making additional inquiries. A radical improvement in the operating position of the company was obviously a matter which every stockholder would be interested in. Transamerica knew this and consequently the intentional imposition of this burden on the individual stockholder helps to persuade me that Transamerica planned to liquidate, etc., Axton-Fisher at the time it mailed the letter.

The non-disclosure of the inventory profit according to historical and orthodox practices may have had little significance —considered abstractly. The reason could be urged that while such fact might not be known to each individual shareholder, it would, however, be known in tobacco and financial circles. This knowledge would,

of necessity, be reflected or discounted in the price at which the stocks sold on the public exchanges. In fact, plaintiffs and the SEC both reluctantly admitted the asset or real value would not be a significant factor in the absence of a plan to liquidate, etc.[9] But, it assumes importance as another and added indication of Transamerica's reluctance to inform the minority stockholders of a matter which vitally interested them. Had there been no plan to liquidate, etc., Transamerica could have given information on both the vastly improved earnings of Axton-Fisher and the vastly increased value of the tobacco leaf industry and still secure the stock at about the stated prices, which were substantially above the market value. This conclusion is demonstrated by the circumstance that Cullman did sell his stock at $47.50 a share, whereas the price offer contained in the letter of November 12, 1942 was $40 a share. He was unquestionably an expert in corporate and tobacco matters and undoubtedly was able to secure through superiority of bargaining power a greater price than other stockholders could have received. He was aware both of the improved operating earnings of the company and the vastly increased value of the tobacco leaf industry.

The price offered in the letter of November 12, 1942 was certainly a fair price to the public minority stockholders of Axton-Fisher—but only under the assumption that *no liquidation etc., was to take place.* My difficulty with the letter of November 12, 1942, as respects defendant, then, is this: *If liquidation, etc., was not intended at that time, why would it not have made the disclosures which it knew any stockholder would wish to know?* The price offered was still a very fair one. In fact, it was some 33⅓% above the market price. The increased value of the inventory was certainly reflected in the market price of the shares; it is even probable that increased earnings were discounted or reflected in the current market price. I think the inescapable conclusion is Transamerica had decided to capture the inventory profit by liquidating, etc., Axton-Fisher and that it purposely failed to make the mentioned disclosures for the express purpose of inducing the minority stockholders to sell their stock at what appeared to be a good price, but, in fact, was not.

Indeed, the price offered was so generous as to indicate there was, in fact, a pre-existing intent to liquidate, etc., and that Transamerica wanted to get the stock and rid itself of other stockholders at a price which would be a bargain, when Transamerica decided the time was ripe to capture the inventory appreciation. I think this circumstance is of paramount importance because it is an indication that in this respect, at least, Transamerica overplayed its hand.

4. There are two parts of the testimony which superficially support defendant's contention there was no plan for liquidation, etc., at the time of the letter of November 12, 1942. The first is Giannini had told Robbins to continue to operate the business of Axton-Fisher as if it were to be a permanent thing. Defendant argues this shows there was no plan for liquidation at this time. This completely misconceives the setting in which such statement was made. At the time of the statement, Giannini had been informed of the enormous benefits through liquidation, etc., of Axton-Fisher. He had also been specifically advised in case Axton-Fisher were sold to one of the major tobacco companies there

---

9. Plaintiffs say: "Knowledge of higher prices payed for auction tobacco would in no wise have suggested a benefit to stockholders so long as the operating future of the company was apparently indicated."

The fact is, however, the SEC first took the position "The asset realization value of shares is of importance only if those who are in a position to do so contemplate the realization of such asset values." Lat-er, the Commission took the strict position that it made no difference whether there was an intention to realize the increased value of the inventory because the public shareholders were entitled to all information concerning this item. In short, the final argument of the SEC was that the materiality of the great increase in the market value of the tobacco inventory was not dependent upon proof of a plan to liquidate.

would be an important item of going concern value. The necessary inference, I think, from Giannini's statement was that he wished to safeguard this valuable right until the time was right for negotiations with the other tobacco companies.

The second part of the testimony which superficially supports defendant's position is that historically Transamerica did not purchase for quick profits but rather purchased for semi-permanent investment. The historical record of Transamerica undoubtedly supports this contention. The weakness of the argument, however, is that in a few months after November 12, 1942, Transamerica did conduct feverish negotiations for the disposition of Axton-Fisher stock for the purpose of capturing inventory profit and consequently showed conclusively it was not adverse to making a quick profit when such policy was indicated.

I have detailed what I consider the master facts. I have considered certain other facts which I have drawn from the record. I accept, as a fact, that at the time the letter of November 12, 1942 was mailed Transamerica planned to capture the Axton-Fisher inventory by merging, dissolving, or liquidating Axton-Fisher. In making this finding I am not unmindful there are certain disparities in the evidence which I have relied on, and I am not unmindful plaintiffs have the burden of showing their theory of the case is more probable than not. I think my conclusion is supported principally by my finding Robbins had an agreement for 5% of the profit to be realized from such a "deal", and from the impossibility of explaining the nondisclosures in the November 12, 1942 letter on any other basis.

The new bonus arrangement, as I have just indicated, is more significant in reaching the conclusion a definite plan to liquidate, etc., was in existence prior to the letter of November 12, 1942. Notwithstanding numerous conflicts in Robbins' testimony, I have no doubt there was such an oral agreement giving Robbins a 5% interest in any profit from the Axton-Fisher deal. This conclusion is based on several factors. For example, after Cullman had suggested liquidation to Giannini, Giannini was anxious to purchase Cullman's stock to "eliminate Cullman as a factor." Robbins at the suggestion of his employer expended great effort in the purchase of the stock from Cullman and other stockholders in 1942. Moreover, the Lorillard-Philip Morris American tobacco negotiations in early 1943 were too zealously performed to suggest that Robbins did not expect compensation. It is hardly credible Robbins would have exerted vast labors to rid Transamerica and himself of his Axton-Fisher monetary livelihood if there was no such arrangement in existence. Finally, perhaps most pertinent of all, is the telephone conversation and subsequent conference in the early part of 1943 between Robbins and Giannini relative to the alleged oral agreement. Negotiations were pending at that time with Philip-Morris for the purchase of Axton-Fisher's holdings. It is plain this—*the manner of compensation* and not the amount—was what annoyed Giannini. He was strongly opposed to any such transfer to Robbins because, as I suspect he knew, it would have placed his commitment to Robbins beyond recall—perhaps weaken his hand in bargaining with the other major tobacco companies.

This inference as to the existence and significance of the 5% bonus arrangement finds added justification, I think, in the admitted memorandum of August 1, 1942. This memorandum persuades me, as indicated before, that something very definitely was in the air by which Robbins was going to lose his lucrative position. The memorandum indicates he was preparing for that eventuality as zealously as possible.

Where there has been a direct conflict in the evidence between Robbins and Giannini I have in most instances accepted the testimony of Robbins not only because he, unlike Giannini, is unaffected by the outcome of this litigation, but more importantly, because the objective facts, e. g., nondisclosures in the letter of November 12, 1942, better support the testimony of Robbins.

Since I find the existence of such a plan to be a fact, it follows defendant must respond in damages.

5. Plaintiffs ask me to reconsider the granting of defendant's motion to dismiss count 1 which, in substance, is a common law action for fraud and deceit. I originally dismissed count 1 on the authority of Geller v. Transamerica Corp., supra. The complaint in the Geller case and the original complaint, here, did charge at the time of the November 12 letter there was a scheme by Transamerica to capture the inventory appreciation by liquidation, etc. These two decisions were made at the pleading stage and it is significant in the Geller case, which is the basic decision affirmed by the Court of Appeals, the pertinent allegation on intent to capture inventory appreciation was made only on information and belief. Upon reflection, and after reviewing the whole record after trial, I have concluded to grant plaintiffs' motion to reconsider my opinion on count 1 and to permit it to stand. The Geller case was argued and decided on a slightly different theory than has been framed now in the Speed case at bar. The Geller case was principally concerned with the existence or non-existence of a fiduciary relationship and as a corollary with the existence or non-existence of a duty to make affirmative disclosures. In the view which I take of the evidence in this case, I think the statements made were misleading because there was a pre-existing intent to capture the inventory appreciation. Hence, I think the charge in count 1 makes out a case for fraud and deceit even at common law. The evidence, here, shows there is more to the case than the narrow and somewhat abstract legalistic propositions considered and discussed by the Court of Appeals and myself in the Geller case.

6. The gravamen of the charge in counts 2, 3. and 4 is since there was such a plan, the non-disclosure of the increased value of the inventory and the improved earnings constituted a violation of subparagraphs 1, 2 and 3 of Rule X–10B–5 of the Securities and Exchange Commission.

In approaching this phase of the case I conclude certain basic facts have been shown. It is established at the time of the stock purchases in question 1. defendant Transamerica was the majority stockholder of Axton-Fisher and "in control" of Axton-Fisher at least in the sense that it possessed full power of control; 2. by virtue of its inside position, it possessed information the cash realization value of Axton-Fisher's assets, represented by its large tobacco inventory, was far greater than the "average cost" book value set forth in defendant's financial statements, for the simple reason of the enormous increase in the market value of the tobacco not shown in the published statements of defendant; 3. this appreciation in value and the amount, because of the quantity and quality of the tobacco inventory and current market prices, were known to defendant by virtue of its inside position and this information was neither publicly disclosed nor made known to plaintiffs as public minority stockholders; 4. defendant, in offering to purchase plaintiffs' stock, failed to disclose its inside information regarding this great appreciation and the value of the tobacco inventory; 5. the price defendant paid for the shares which it purchased from plaintiffs, while in excess of current market price, was far below the redemption or liquidating value of the shares; and finally, 6. defendant subsequently caused the dissolution of Axton-Fisher—captured for itself the enhanced value of the purchased shares in the form of liquidating dividends which came to defendant Transamerica.

■ *The plan of Transamerica prior to November 12, 1942 to capture the Axton-Fisher inventory by merging, dissolving or liquidating Axton-Fisher is the crucial finding in this case.* The non-disclosure of the increased earnings and increased value of the tobacco inventory in the light of the existence of such a plan constitutes a violation of subsections 1, 2 and 3 of Rule X–10B–5 of the Securities and Exchange Commission. These factors—the non-disclosures of the increased earnings and increased value of the tobacco inventory—have significance because there was such a plan.

■ In my view, the facts show a violation by defendant of Rule X–10B–5, promulgated by the SEC under Sec. 10(b) of the Securities Exchange Act of 1934, 15 U.S.C.A. § 78j(b). The rule is clear. It

is unlawful for an insider, such as a majority stockholder, to purchase the stock of minority stockholders without disclosing material facts affecting the value of the stock, known to the majority stockholder by virtue of his inside position but not known to the selling minority stockholders, which information would have affected the judgment of the sellers. The duty of disclosure stems from the necessity of preventing a corporate insider from utilizing his position to take unfair advantage of the uninformed minority stockholders. It is an attempt to provide some degree of equalization of bargaining position in order that the minority may exercise an informed judgment in any such transaction. Some courts have called this a fiduciary duty while others state it is a duty imposed by the "special circumstances". One of the primary purposes of the Securities Exchange Act of 1934, 15 U.S.C.A. § 78a et seq., was to outlaw the use of inside information by corporate officers and principal stockholders for their own financial advantage to the detriment of uninformed public security holders. I gave approval to this view of the Act in an earlier opinion in the case at bar [10] when I denied Transamerica's motion for summary judgment.

Moreover, I reject Transamerica's four contentions with respect to counts 2, 3 and 4 in that 1. it had no duty to disclose under Rule X–10B–5 its inside information; 2. that if the Rule requires such disclosure, it violates the Fifth Amendment to the Constitution of the United States; 3. that the Rule was not authorized by Sec. 10(b) of the Act if construed to apply to securities transactions such as those here involved because they were not effected on a stock exchange or through the media of professional broker-dealers, or to a stock purchase not involving any express misrepresentations; and 4. both Sec. 10(b) and Rule X–10B–5 violate the Fifth Amendment and are invalid as unconstitutional delegations of legislative powers.

Defendant's contention that only express misrepresentations or half-truths are unlawful fails to look at the fact that an implied misrepresentation is just as fraudulent as an express one and constitutes an untrue statement of a material fact within the meaning of the governing Rule. Charles Hughes & Co., Inc. v. S. E. C., 2 Cir., 139 F.2d 434, certiorari denied, 321 U.S. 786, 64 S.Ct. 781, 88 L. Ed. 1077; Kardon v. National Gypsum Co., D.C., 73 F.Supp. 798, at page 800; Hughes v. S. E. C., 85 U.S.App.D.C. 56, 174 F.2d 969. Defendant's liability for non-disclosure is not based primarily upon the provision of subparagraph 2—subparagraph 1 of the Rule makes it unlawful "To employ any device, scheme, or artifice to defraud" and subparagraph 3 outlaws "any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person * * *". The three subparagraphs of this broadly remedial rule are mutually supporting and not mutually exclusive as defendant contends. Defendant's breach of its duty of disclosure accordingly can be viewed as a violation of all three subparagraphs of the Rule, i e., (1) a device, scheme, or artifice to defraud; (2) an implied misrepresentation or misleading omission; and (3) an act, practice or course of business which operates or would operate as a fraud upon the plaintiffs.

Plaintiffs advance an additional argument to support their position. This argument is when defendant offered $40 and $12 a share respectively for the Class A and Class B stock of Axton-Fisher in the letter of November 12, 1942 it was in itself a representation that was a fair value of the stock. It then argues assuming there was a plan to liquidate, etc., Axton-Fisher, such price was grossly inadequate and this also constituted a misrepresentation. Defendant argues the rule has no application here because obviously Transamerica intended to make some profit on their purchase. It argues this is the sole reason for any purchase. It further argues the relationship between Transamerica and the minority stockholders was not such as to call into operation the rule urged by plaintiffs. Since I do not think the disposition of this

10. Speed v. Transamerica Corp., D.C.Del., 71 F.Supp. 457.

830

question is necessary to the decision here, I shall leave the matter undecided. I do not think it necessary to the disposition because in this connection, the same as with increased earnings and increased value of the inventory, this argument does not have independent legal significance, but is dependent solely upon the establishment of a plan by Transamerica prior to November 12, 1942 to merge, dissolve, or liquidate Axton-Fisher. In short, the contention becomes important only after the establishment of the pre-existing plan. We have, here, sufficient such reasons in the non-disclosure of the vastly increased earnings and vastly increased value of the inventory, to support violation of the SEC rule where there has been an express finding of the existence of such a plan.

■ Defendant misreads the scope of the Act when it contends that the stock purchases do not fall within the purview of the statute and that Rule X–10B–5 cannot validly be applied to those purchases, because the Act does not attempt to regulate securities transactions not effected on an organized exchange or in the "over-the-counter market". Sec. 10(b) makes it unlawful for "any person" by the use of any means or instrumentality of interstate commerce or of the mails to employ a fraudulent device in contravention of Rule X–10B–5 in the purchase of "any security registered on a national securities exchange or any security not so registered." The terms "person", "broker", and "dealer" are separately defined by subparagraphs (9), (4) and (5) of § 3(a), respectively, 15 U.S.C.A. §§ 78c (a) (9), (4), (5). These are unambiguous provisions. An over-the-counter transaction is simply one which does not utilize the facilities of a securities exchange, but under the unambiguous provisions of the Act it covers the sale or purchase of a security on a doorstep as well as the trading of a professional securities broker.[11] It would appear that over-the-counter transactions, as such, are not specifically regulated by the Act, but they are dealt with through provisions directed at the trading activity of "any person" in "any security".[12] In short, Congress did not intend to limit application of the Act to transactions on exchanges and in the organized over-the-counter markets maintained by brokers and dealers. It is also

11. See, for example, the following statement which appears in H.R.Rep.No.2307, 75th Cong., 3d Sess. (1938), p. 2, and in Sen.Rep.No.1455, 75th Cong., 3d Sess. (1938), p. 2:

"Under the Securities Exchange Act of 1934, the over-the-counter markets are deemed to include all transactions in securities which take place otherwise than upon a national securities exchange. These markets are immense, the activities embraced therein are varied, and they are of the utmost importance to the national economy."

Compare also the following statement of Wallace R. Fulton, Executive Director of the National Association of Securities Dealers, Inc., in Fundamentals of Investment Banking, Sec. 8, p. 42 (Investment Bankers Association of America, 1947):

"First of all, what is meant by the over-the-counter market? Briefly, this market embraces all transactions in securities not made on stock exchanges."

12. The extensive remedial scope of the bill which became the Securities Exchange Act was described by Senator Steiwer (78 Cong.Rec. 8296):

"All through the bill there may be multiplied the instances, nearly 30 in number altogether, I believe, which clothe the Commission with power to make rules and regulations which, as I have said, are applicable, not alone to stock exchanges, to over-the-counter markets, and members and brokers and dealers, but are applicable to the public at large and to all who may trade in securities, to all owners and holders of stock, to corporations, to their officials, * * *".

Compare also the statement of Representative Lea in opening the discussion of the bill in the House of Representatives (78 Cong.Rec. 7861):

"This bill, although it is called a bill to regulate national securities exchanges, is much broader in its practical operation. In fact, the object of this measure is not merely to regulate exchanges—that is only incidental to its purpose. The real purpose of this regulatory measure is to protect the investors of the United States against fraud and imprudent investments * * *"

shown by the broad definition of the term "security" in § 3(a) (10) of the Act, as construed by the courts. S. E. C. v. W. J. Howey Co., 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244; S. E. C. v. C. M. Joiner Leasing Corp., 320 U.S. 344, 64 S.Ct. 120, 88 L.Ed. 88; Kardon v. National Gypsum Co., D.C.E.D.Pa., 69 F.Supp. 512; Slavin v. Germantown Fire Insurance Co., D.C. E.D.Pa., 74 F.Supp. 876, affirmed 3 Cir., 174 F.2d 799; Speed v. Transamerica Corp., D.C.Del., 71 F.Supp. 457. Judge Grim has been the first to consider specifically the question whether § 10(b) and Rule X–10B–5 apply to transactions in securities not traded on an exchange or in the over-the-counter market. He concluded that the applicability of the rule "is so clear from the language of Section 10(b) itself that no other interpretation is possible." See Robinson v. Difford, D.C.E.D.Pa. 92 F.Supp. 145.

Under the "deceptive device or contrivance" clause of § 10(b) of the Securities Exchange Act of 1934, the SEC is authorized to adopt the anti-fraud provisions of Rule X–10B–5 which are applicable to a stock purchase such as made by Transamerica in the case at bar. All through its lengthy argument on this point, defendant improperly assumes that the word "deceptive" must be limited to market manipulations. Market manipulation is but one specific type of deceit.[13] To limit the term "deceptive" to that type of deceit would run counter to the principle language of § 10(b). In none of the cases cited, immediately above, was there any element of market manipulation. The acts were based solely on a fraudulent sale or purchase of securities.

7. Defendant's arguments on the constitutionality of § 10(b) and Rule X–10B–5 are shop worn and have been rejected by other courts. The rule is said to contravene the Fifth Amendment by reason of vagueness, indefiniteness and uncertainty. It is argued that the terms "fraud" and "deceit" are unconstitutionally vague and indefinite when they attempt to impose higher standards of conduct in securities transactions, subject to federal jurisdiction, than those imposed by the existing common law. As stated, such arguments were rejected in Charles Hughes & Co., Inc., v. S.E.C., 2 Cir., 139 F.2d 434, certiorari denied, 321 U.S. 786, 64 S.Ct. 781, 88 L.Ed. 1077; Coplin v. United States, 9 Cir., 88 F.2d 652, certiorari denied, 301 U.S. 703, 57 S.Ct. 929, 81 L.Ed. 1357. In this connection, it is to be noted in Norris & Hirshberg, Inc. v. S.E.C., 82 U.S.App. D.C. 32, 163 F.2d 689, it was expressly held that Rule X–10B–5 cannot be limited by common law standards of fraud and deceit; and in Hawkins v. Merrill, Lynch, Pierce, Fenner & Beane, D.C.W.D.Ark., 85 F. Supp. 104, the Court said essentially the same thing in holding that the Rule must be construed so as to effectuate the statutory purpose of protecting investors and redressing wrongs which Congress sought to prevent. None of the courts had any difficulty in applying the language of § 10(b) and Rule X–10B–5 which the defendant Transamerica now says is too vague and indefinite.

Moreover, the general acceptance and enforcement over a long period of time, and without any serious difficulty of construction, of § 17 of the 1933 Act,[14] whose

---

13. Harris v. United States, 9 Cir., 48 F. 2d 771; United States v. Brown, D.C. S.D.N.Y., 5 F.Supp. 81; affirmed 2 Cir., 79 F.2d 321, certiorari denied McCarthy v. United States, 296 U.S. 650, 56 S.Ct. 309, 80 L.Ed. 462; Coplin v. United States, 9 Cir., 88 F.2d 652, certiorari denied 301 U.S. 703, 57 S.Ct. 929, 81 L. Ed. 1357.

14. Edwards v. United States, 312 U.S. 473, 61 S.Ct. 669, 85 L.Ed. 957; Kopald-Quinn Co. v. United States, 5 Cir., 101 F.2d 628, certiorari denied, Rice-baum v. United States, 307 U.S. 628, 59 S.Ct. 835, 83 L.Ed. 1511; Bogy v. United States, 6 Cir., 96 F.2d 734, certiorari denied 305 U.S. 608, 59 S.Ct. 68, 83 L.Ed. 387; S.E.C. v. Torr, D.C., 15 F. Supp. 315, reversed on other grounds, 2 Cir., 87 F.2d 446; Landay v. United States, 6 Cir., 108 F.2d 698; McMann v. Engel, D.C., 16 F.Supp. 446; Troutman v. United States, 10 Cir., 100 F.2d 628, certiorari denied 306 U.S. 649, 59 S.Ct. 590, 83 L.Ed. 1047; Seeman v. United States, 5 Cir., 90 F.2d 88.

language is virtually identical with Rule X–10B–5, lends strong support to the conclusion that its meaning is sufficiently certain to be comprehended by a "reasonable and well-intentioned citizen". Likewise, the similar § 15(c) (1) of the 1934 Act, Rule X–15C1–2 thereunder,[15] and Rule X–10B–5,[16] have heretofore been applied over a substantial period of time by various courts without any problem of unconstitutional vagueness.[17]

■ The remaining contention of defendant that § 10(b) contains an invalid delegation of rule-making powers is likewise without merit. In Charles Hughes & Co., Inc., v. S.E.C., supra, in rejecting a similar contention that § 15(c) (1) was "unconstitutional because of an unconstitutional delegation of legislative power", Judge Clark wrote, 139 F.2d at page 436:[18]

"The objections to § 15(c) (1) of the Securities Exchange Act and to S.E.C. Rule X–15C1–2 are insubstantial. The standard for determining the acts prohibited by § 15(c) (1) is set up in the statute itself, and is more than adequate. The fact that the devices must be 'manipulative, deceptive, or otherwise fraudulent' makes certainly for far more definitiveness than such a standard as was approved by the Supreme Court in Buttfield v. Stranaham, 192 U.S. 470, 24 S.Ct. 349, 48 L.Ed. 525, and in numerous other cases. See,

also, Smolowe v. Delendo Corp., 2 Cir., 136 F.2d 231, 240 [148 A.L.R. 300], certiorari denied [320 U.S. 751], 64 S.Ct. 56 [88 L.Ed. 446]."

■ I conclude that § 10(b) when read in the light of the 1934 Act contains adequate standards for the rule-making powers delegated to the Commission.

■ Likewise, defendant's last assault on the constitutionality of § 10(b) has no effect, for that section plainly does not violate the due process clause of the Fifth Amendment. The invalidity of any statute under the due process clause depends on whether it is unreasonable, arbitrary and capricious and whether the means selected have a real and substantial relationship to the object sought to be attained. No specific argument has been brought forth to show where the language of the Act is unreasonable, arbitrary, or of a capricious character. In enacting the section, Congress sought to eliminate, within the sphere of federal jurisdiction, all deceptive devices or contrivances, including those by which corporate insiders could unfairly and dishonestly deal with public investors. As stated by Judge Cardozo, "one is at a loss to imagine how" this broad objective "could be more accurately stated, without a catalogue of particulars not susceptible of enumeration in advance of the event."[19]

---

15. See e. g., Archer v. S.E.C., 8 Cir., 133 F.2d 795, certiorari denied, 319 U.S. 767, 63 S.Ct. 1330, 87 L.Ed. 1717; Geismar v. Bond & Goodwin, Inc., D.C., 40 F.Supp. 876.

16. See Kardon v. National Gypsum Co., D.C., 69 F.Supp. 512, and D.C., 73 F. Supp. 798; Slavin v. Germantown Fire Ins. Co., 74 F.Supp. 876, affirmed, 3 Cir., 174 F.2d 799; Fry v. Schumaker, D.C., 83 F.Supp. 476; Fifth-Third Union Trust Co. v. Block,* Civ.Act. No. 1507, S.D.Ohio Dec. 11, 1946; Acker v. Schulte, D.C., 74 F.Supp. 683; Speed v. Transamerica Corp., D.C.Del., 71 F.Supp. 457.
* No opinion for publication.

17. See also the multitude of cases construing and enforcing the mail fraud statute, and the statutes declaring it a federal crime to defraud the United

States, 18 U.S.C.A. § 338, pp. 136–208, and 1947 Cumulative Supplement, pp. 34–134; 18 U.S.C.A. §§ 74, 79, and 80, pp. 100, 105, 106–116; and 1947 Cumulative Supplement, pp. 53–56; now, respectively, 18 U.S.C. §§ 1341, 1002, 1003 and 1001, Pub.L.No.772, c. 645, 80th Cong., 2d Sess. (1948).

18. Cf. Wright v. S.E.C., 2 Cir., 112 F. 2d 89, 94–95, upholding the expulsion provisions of § 19(a) (3) of the 1934 Act. See also United States v. McDermott, 7 Cir., 131 F.2d 313, certiorari denied, 318 U.S. 765, 63 S.Ct. 664, 87 L. Ed. 1137, upholding § 7(a) of the Act, empowering the Federal Reserve Board to promulgate rules "For the purpose of preventing the excessive use of credit".

19. People v. Mancuso, 255 N.Y. 463, 175 N.E. 177, 179, 76 A.L.R. 514.

8. Finally, I shall briefly consider the question whether a proper class action is alleged. In Speed v. Transamerica Corp., D.C.Del. 1945, 5 F.R.D. 56, I held that the complaint did not state a proper class action. The complaint, as has been shown, was amended to allege that at the time of the November 12 letter there was a pre-existing intent to capture the appreciated inventory by liquidation, etc. The theory of the complaint, as interpreted by the court, is that the letter was misleading in the light of this pre-existing intent, which was unknown to all the stockholders sought to be made members of the class. Consequently, I think it is at least a good spurious class suit of the sort authorized by Fed. Rule Civ.Proc. 23(a) (3), 28 U.S.C.A. See also, Zahn v. Transamerica Corp., 3 Cir., 162 F.2d 36, 172 A.L.R. 495. My previous decision, which I think was right on the theory of the case as it then stood, is not even pertinent in view of the present complaint and the facts which I have adopted in this opinion.

9. This is a long opinion, but, paradoxically as it may seem, I have not separately considered many portions of the testimony. This testimony, nevertheless, is reflected in my consideration and determination of the portions of the testimony which I deem most significant. Many other separate points were briefed and argued. I have given all of them long consideration, but conclude they are without merit for either statement or decision.

I shall not make any specific finding as to the precise amount of recovery per share. I shall discuss in my consideration of Friedman v. Transamerica, C.A. 468, infra, the form of relief which may be granted.

### Formal Findings in Speed v. Transamerica: CA480

Although I have discussed at length the factual background of this particular case above, I think it appropriate and perhaps helpful to the Court of Appeals if they have in addition to the facts found in my opinion, my formal findings.

*Origin of Transamerica Corporation's ownership of a controlling interest in the Axton-Fisher Tobacco Company*

1. The Capital Company entered into an agreement to purchase 80,610 shares of Axton-Fisher Class B stock from the Standard Commercial Tobacco Company under date of March 21, 1941, said agreement to take effect May 14, 1941. (Pl. Giannini No. 1).

2. L. M. Giannini was directly responsible for the negotiations surrounding the purchase agreement (Giannini Dep. I, p. 5).

3. Transamerica purchased the 80,610 Class B shares offered under the contract between the Capital Company and Standard Commercial Tobacco Company (Giannini Dep. I, pp. 13 & 16).

*Findings Relating to Control of Axton-Fisher by Transamerica*

4. Transamerica was, and is, a "Holding Company". (Giannini Dep. I, p. 95).

5. The acquisition of the 80,610 Class B shares gave Transamerica 46.97% control of the voting stock of Axton-Fisher (Pl. Andrews No. 7-C).

6. Carl B. Robbins was named President and Chairman of the Board of Directors of Axton-Fisher at Transamerica's suggestion (Answer of defendant, para. 16). Giannini personally selected Robbins as chief executive of Axton-Fisher (Giannini Dep. I, pp. 10–11).

7. Giannini was responsible for fixing the amount of Robbins' salary (Robbins Dep. II, p. 9).

8. Carl B. Robbins had been consulting economist for the Bank of America, of which L. M. Giannini was president (Robbins Dep. II, p. 136). (Giannini Dep. I, 24).

9. It was Robbins' practice to consult Giannini before anything of importance was recommended to the Board (Robbins Dep. I, p. 23).

10. Leonard G. Hunt, agent for Transamerica, and exercising defendant's proxy, nominated the Board which was elected at the meeting of May 24, 1941. (Def. Brannon No. 10). Moreover, L. M. Giannini attended the meetings of the Board on June 28, 1941 and July 2, 1941 (Def. Brannon No. 9 and No. 12).

11. Carl B. Robbins was allowed relatively free rein in the conduct of the operational phase of Axton-Fisher business, whereas Transamerica governed its financial policies (Robbins Dep. II, pp. 107, 131, 151–152 Dawson Dep. I, p. 9).

12. During the first nine months of Transamerica's control, five members of the board were replaced (Def. Robbins No. 11).

13. The new members of the Board were elected with L. M. Giannini's knowledge, and presumably with his approval (Robbins Dep. I, pp. 16–17).

14. The members of the Board considered Robbins as representing the views, desires and policies of Transamerica, and endeavored to follow Robbins' suggestions (Dawson's Dep. pp. 87 and 99).

15. Robbins was in constant communication with Transamerica (Robbins Dep. II, p. 21; Dawson's Dep. p. 7) and made frequent trips to California (Def. Trial No. 21; Pl. Harvey Nos. 6, 7, 8, 9 and 10).

16. Transamerica requested that it be kept informed on all current matters (Robbins Dep. I, pp. 22–23).

17. Transamerica received monthly statements of Axton-Fisher (Robbins Deposition of January 8, 1948, p. 36) (Andrews Dep. II, p. 24).

18. Giannini "suggested" the sale of some tobacco leaf in 1941, and a majority of the Axton-Fisher Board concurred (Robbins Dep. I, p. 53).

19. The redemption of the Class A stock, on April 30, 1943, was made at the suggestion of Transamerica (Andrews Dep. I, pp. 94–95) Robbins Dep. II, p. 108).

20. The eventual dissolution of Axton-Fisher was performed at the suggestion of Transamerica (Pl. Andrews No. 18–B).

21. Transamerica committed itself to a recapitalization plan for Axton-Fisher on December 19, 1941 (Pl. Giannini No. 13 pp. 3–4).

a. Transamerica influenced by telegram, the terminology of the press release announcing such plan (compare Pl. Trial No. 5, par. 5, with telegram, Pl. Trial No. 6).

b. On January 22, 1942 publication of the SEC recapitalization plan was made, and it was stated: "News of the generous offer to stockholders brought higher quotations on the shares." (Admission IV (a).

(c) Axton-Fisher A stock rose as much as 8 points (to 33) in one day upon hint of the issuance of the recapitalization plan (Admission IV (a)) (Andrews Dep. I, pp. 45–46).

(d) Transamerica entered into a formal commitment on February 11, 1942 to purchase new prior preferred shares up to the amount of approximately $1,000,000 (Pl. Andrews No. 9; Def. Brannon No. 16).

(e) Transamerica advised Axton-Fisher on or about April 21, 1942 of its intention not to extend the commitment (Pl. Giannini No. 4) thereby causing the withdrawal by Axton-Fisher of the recapitalization plan (Pl. Andrews No. 10; identical with the actual press release dated May 7, 1942, attached to Pl. Brannon No. 1).

(f) Publication of the abandonment of the SEC recapitalization plan occurred on May 8, 1942. Announcement was there made that thenceforth Transamerica "will feel free to buy or sell or otherwise trade in the various issues of Axton-Fisher securities, if its judgment should dictate such action." (Admission IV (c)).

22. There was close concurrence in time between the issuance of the press release, inspired by defendant, withdrawing the SEC recapitalization plan, and the visit of Transamerica's nominee, Robbins, to San Francisco in May, 1943, at which time Giannini and Robbins discussed liquidation (Pl. Robbins No. 7, and Pl. Harvey No. 28).

23. Immediately following the abandonment of the SEC plan, "A" prices dropped from a high of 31¼ to a high of 21½, and "B" prices dropped from 9 to 6 in June, 1942 (Admission II, Exs. A and B).

*Findings relating to the origin of a plan to capture the value of the Axton-Fisher inventory or otherwise profitably dispose of Transamerica's investment in Axton-Fisher*

24. Transamerica knew in May of 1941, when it purchased its interest in Axton-Fisher, that a large inventory appreciation had occurred over the value carried on the books (Giannini Dep. I, pp. 48–9).

25. Giannini was influential in the acquisition by Axton-Fisher of extraordinarily large stocks of tobacco in 1941 (Robbins Dep. I, pp. 52–53).

26. The acquisition of such large tobacco stocks was for the purpose of making a profit out of the inventory if operations should prove inadvisable (Robbins Dep. II, p. 67).

27. Robbins, on October 22, 1941 wrote Leonard G. Hunt, Transamerica's agent, that "no one could estimate what our inventories would bring in liquidation at the present time" and "Crop replacement exceeds the September 30th book value by 99.8%" (Pl. Robbins No. 4).

28. The reason given by Transamerica for the withdrawal of the SEC recapitalization plan was neither complete nor true in that other factors operated in defendant's decision than war reverses, and the decline in value of preferred stocks; and in particular defendant did not desire:

a. To disclose to the SEC "the activities, if any, by L. Mario Giannini with respect to selecting executive personnel and formulating policies of the registrant" (Pl. Giannini No. 3, item 4).

b. to prepare a tabulation showing the liquidating value of the stock to be surrendered and the stock to be issued (id. p. 6).

c. To disclose its intention with regard to the holding or liquidation of the new shares and the class B shares owned by Transamerica (id. p. 10).

29. During the first months of 1942, Transamerica was made aware of the great acceleration in value of the tobacco inventory:

a. The balance sheet for January 1942 showed an increased value of inventory of $581,264.65 over the value as of January 1941 (Pl. Robbins No. 9–A).

b. The balance sheet of February 1942 showed an increased value of inventory of $1,541,339.60 over the value as of February 1941 (Pl. Robbins No. 9–B).

c. Based upon the habits of the industry, Axton-Fisher had acquired an abnormally large inventory (Robbins Dep. I, p. 52).

*At or about the time defendant caused the withdrawal of the SEC plan, it had evolved a design to capture to itself the hidden profit in Axton-Fisher by liquidation or commensurate means.*

30. On May 6, 1942, the day preceding the issuance of the press release announcing the abandonment of the SEC plan, Carl B. Robbins wrote Transamerica, saying that he had arranged to arrive in San Francisco on May 28th, and asking whether Transamerica objected to the issuance of the press release (Pl. Robbins No. 7).

31 On May 22, 1942, Jos. F. Cullman, Jr., a former director of Axton-Fisher who resigned on February 26, 1942 (Def. Robbins No. 11) wrote Giannini, suggesting liquidation of Axton-Fisher (Def. Giannini No. 2–A). This letter was immediately sent to Robbins and reached him before his departure for San Francisco (Giannini Dep. III, p. 5). Robbins prepared a draft of a reply to Cullman while on board train (Def. Giannini No. 3), whereas Giannini had independently replied to Cullman's letter under date of May 27, 1942, and suggested that Cullman's proposal be submitted to Transamerica in concrete form (Def. Giannini No. 2–B).

32. Upon Robbins' arrival in San Francisco, the subject of liquidation was discussed by him and Giannini (Robbins Dep. II, p. 20; Giannini Dep. III, p. 6), (Answer of Def. in the Friedman case, para. 27). The subject of recapitalization was not considered (Robbins Dep. I, p. 48).

33. During Robbins' trip to San Francisco of May 1942, (Pl. Harvey No. 28) he was entertained at Giannini's home in Atherton, California and was driven by Giannini to Palo Alto, where he boarded the "Lark" for Los Angeles (Robbins Dep. III, pp. 8, 9, 10; Giannini Dep. III, pp. 12 and 30).

34. During the visit and automobile ride (supra), discussion arose over the subject of a 5% commission on Transamerica's profits to be received by Robbins if Transamerica should decide to cash in on its investment in Axton-Fisher, and the subject of an offer made to Robbins that he become president of Transamerica Corporation at $50,000 per year in order that taxes might be reduced on his share (Robbins Dep. II, pp. 23–33; Robbins Dep. III, p. 10).

35. Giannini's testimony and his memorandum of April 1, 1943 (Def. Giannini No. 11–A) demonstrate that there was an agreement between Robbins and Giannini prior to April 1, 1943, consequently in effect during the summer of 1942, which provided for the participation by Robbins in 5% of Transamerica's profits on its investment in Axton-Fisher rather than the pre-existing arrangement of 5% of the net profits of Axton-Fisher over an historical basis.

36. During the May 1942 visit, Robbins pointed out to Giannini the disadvantages which would accrue if Axton-Fisher were to cease its advertising and selling of new products, thereby giving notice to the industry that Axton-Fisher was about to be liquidated (Robbins Dep. II, p. 30).

37. At that time, liquidation was a "predominant possibility" in Giannini's mind (Robbins Dep. II, p. 30).

38. On June 9, 1942, Cullman wrote to Giannini and spoke of having devised a "concrete plan" for liquidation (Pl. Andrews No. 22–A); on June 16, 1942, Giannini replied to Cullman and suggested that he contact W. L. Andrews, vice-president of Transamerica (Pl. Andrews No. 22–B).

39. Giannini prepared a memorandum on June 16, 1942 stating objections to the development of new brands of cigarettes, and objections to recapitalization plans (a) until Transamerica should have a sufficient number of Class A shares to be able to have ⅔ of the votes if in the end it should develop to be a contest between Transamerica and Cullman (b) that

before any recapitalization plan was put forth, the six months earning figures should be looked at (Def. Giannini No. 4).

40. Defendant immediately entered upon an extended program of purchasing Axton-Fisher A and B stock (Pl. Trial No. 9).

a. Transamerica purchased 6842 shares of A stock between June 22 and September 16, 1942, at an average price of $29.52 per share (Pl. Trial No. 9).

b. Transamerica purchased from Cullman and associates on September 18 and 22, 1942, 9430 shares of A stock at $47.50 per share (Pl. Trial No. 9).

c. Transamerica purchased no stock between September 22 and November 30, 1942 (Pl. Trial No. 9).

d. Through the offer of November 12, 1942 Transamerica received 13,356 A shares at $40 per share, and 5707 B shares at $12 per share (Pl. Giannini No. 13, pp. 1–2).

e. Between December 30, 1942 and April 28, 1943, Transamerica purchased 4215 shares of B stock at an average price of $25.30 per share (Pl. Trial No. 9).

f. On April 28, 1943, Transamerica purchased 493 shares of B stock at $42 per share (Pl. Trial No. 9).

41. During the summer of 1942 it was agreed between Robbins and Giannini that neither should discuss the possibility of discontinuing operations and capturing the inventory value (Robbins Dep. of January 8, 1948, p. 206).

42. On July 1, 1942, Robbins wrote Giannini, enclosing stock option agreements for himself and J. C. Williams, employee and director of Axton-Fisher. The letter expressed the hope "that the enclosures will effectuate what you have in mind." The option agreements contained a clause that if Transamerica undertook to sell its holdings, it would undertake to obtain a similar offer for the optional shares. (Def. Robbins No. 13–A, 13–B, 13–C). On August 1, 1942, Giannini replied to Robbins that the options did not "conform to my ideas on the subject", but "I expect that we will see one another

in the not too distant future at which time we can, I am sure, conclude satisfactory arrangements." (Def. Giannini No. 13–D).

43. On July 2, 1942, W. L. Andrews wrote Robbins suggesting that it was a little too soon to spend much time in the preparation of a plan of recapitalization (Pl. Robbins No. 8–A).

44. On July 7, 1942, Robbins wrote Andrews, explaining that one of the Louisville attorneys, Mr. Fields, had mistakenly begun work upon a recapitalization, and that he (Robbins) hoped the purchase program would be concluded satisfactorily, and that he believed that "Mario's plan will go over with them." (Pl. Robbins No. 8–B).

45. Mario's plan, in fact, was the plan which culminated in the cash purchase under Transamerica's offer of November 12, 1942 (Robbins Dep. I, pp. 48–51). (See Brief, pp. 50–55).

46. No recapitalization plan following the abandonment of the SEC plan was seriously considered or offered to the Board of Directors of Axton-Fisher for their consideration up to and including the dissolution of Axton-Fisher. (Andrews Dep. I, p. 76).

47. Transamerica received the Axton-Fisher statement for the month of June, 1942 (Andrews Dep. II, p. 24). That statement showed an operating loss for the first six months of $17,241.77 before other income and deductions. (Pl. Robbins No. 9–F).

48. Notwithstanding Transamerica's alleged reason for abandoning the SEC recapitalization plan on May 7, 1942, because of the decline in value of preferred stocks, on or about September 18, 1942, Transamerica purchased a bloc of 9430 A shares from Cullman and associates for $47.50 per share (Pl. Giannini No. 13, p. 1) whereas the market price of A shares was then listed between 24 and 26 on the curb exchange. (Admission II, Ex. A).

49. Transamerica's reason for the purchase of the Cullman shares was to preclude participation by Cullman in defendant's ultimate disposal of Axton-Fisher, to enhance defendant's own profits upon that eventuality, and was not in furtherance of any plan of recapitalization which under the terms of Giannini's June 16, 1942 memo would necessarily have been abandoned, and, in fact, was abandoned.

50. An inventory of the Axton-Fisher tobacco was made up for the month ending July 31, 1942, dated August 17 & 18, 1942 showing an insurance coverage of 90% of the difference between cost and cost of replacement (Def. Barham No. 5). The inventory showed a replacement value of the tobacco figured on 100% of such replacement value, equal to $19,307,557 (Def. Barham No. 5; Pl. Giannini No. 13, p. 16) whereas the tobacco was carried on the Axton-Fisher balance sheet at a cost of $9,845,983.25 (Pl. Robbins No. 9–G).

51. The July 31, 1942 inventory was available to Robbins in the normal course of business (Barham Dep. pp. 23–24) (Bethea Dep. p. 5).

52. OPA ceiling prices were imposed upon flue-cured tobacco, effective August 29, 1942 (Def. Trial Ex. No. 28).

53. It was common in the tobacco industry that governmental regulations should be known some time prior to actual issuance; particularly known to one, as Robbins, who had an extensive background of association with government agricultural agencies (Barham Dep. pp. 24–25; Giannini Dep. III, p. 24) (Robbins Dep. II, pp. 68–69).

54. The normal tobacco inventory of Axton-Fisher was approximately: flue-cured 50%; burley 38%; Maryland 4%; Turkish 8% (Barham Dep. p. 10; Robbins Dep. II, p. 139).

55. Tax laws in effect in 1942 and following years imposed heavy taxes (normal and excess) against corporate income other than income through capital gains.

a. A sale of the inventory of Axton-Fisher would have resulted in a high normal and excess profits tax, therefore was not a feasible method of capturing the inventory value (Brauberger Dep. p. 14).

b. Sale of Axton-Fisher stock by Transamerica was actually not a feasible method of realizing on the increased value of the tobacco inventory for any purchaser would have paid a price for the stock reflecting the value of the inventory, and moreover, would have paid a further tax based on the profit made on the inventory over the cost basis of Axton-Fisher (Pl. Brauberger No. A, p. 1; Robbins Dep. 1, p. 62).

c. The most feasible method whereby Transamerica could obtain a high profit upon its investment in Axton-Fisher was through liquidation of that company; distribution in kind of the tobacco inventory; and a consequent sale of the distributed tobacco to interested purchasers. (Robbins Dep. II, pp. 55–56).

56. The receipt of 24,000 A shares and 18,000 B shares, the prescribed number under the letter of November 12, 1942, would have given Transamerica 89.5% of the outstanding shares of Axton-Fisher (Pl. Trial No. 9). Under the provisions of I R C 112–B–6, the ownership of more than 80% of Axton-Fisher stock would enable defendant to receive the assets of Axton-Fisher under a tax-free dissolution.

57. Cessation of manufacture of tobacco products and/or reduction of advertising and sales expenses by Axton-Fisher would have resulted in notice to the world that Axton-Fisher was to cease operations and would have resulted in its immediate diminution in value as a going concern, and have placed it in a "necessitous position" insofar as disposal of its stock or tobacco inventory were concerned. On the other hand, maintenance of advertising and selling expense and the continued production of cigarettes would operate, and did operate, to improve Transamerica's profit upon disposal of its investment (Robbins Dep. II, pp. 197–225).

58. Compared with a loss of $17,241.77 before taxes and other income for the first six months of 1942 (Pl. Robbins No. 9–F), Axton-Fisher showed a profit of $143,545.-95 before taxes and other income for the first eight months of 1942 (Pl. Robbins No. 9–H).

59. The profit for the last six months showed an increase of $633,278.34 over the first six months of 1942 (Pl. Robbins No. 9–L).

60. Carl B. Robbins made a trip to San Francisco in August and September of 1942 (Def. Trial No. 21).

61. While in San Francisco, Robbins held a conference with L. M. Giannini on August 31, 1942 (Def. Trial No. 21, letter of August 24, 1942 to Fisher from Robbins) (Giannini Dep. III, p. 7).

a. At this conference the subject of liquidation or disposal of Transamerica's investment in Axton-Fisher was discussed.

b. Giannini appeared "quite happy" about the possibility of capturing the great inventory profit through liquidation.

c. Giannini advised Robbins to go forward as though operations were going to be carried on in the normal way.

d. Robbins provided Giannini with an inventory showing the number of pounds and value of the tobacco by Axton-Fisher.

e. Robbins informed Giannini that flue-cured tobacco was, or was about to be, placed under OPA price ceilings so that any further accretion in value of flue-cured tobacco was foreclosed.

f. Robbins informed Giannini that OPA ceilings on Burley tobacco had not yet been imposed, and for that reason Robbins did not recommend liquidation at the time.

g. Robbins informed Giannini that taxwise it would be to the great advantage of Transamerica to liquidate, thus enabling the stockholders to capture a profit after taxes equal to about the entire surplus that had been accumulated by the company in forty years of operation. (Robbins Dep. II, pp. 23–33; Id. pp. 107–225; Compare Giannini Dep. III, pp. 7–12, and Id. p. 30, lines 18 and 19).

62. The subject of conference did not refer solely to Robbins' compensation as President of Axton-Fisher, nor his receipt of an option to purchase 2000 shares of Axton-Fisher Class B stock, nor to the operating and merchandising problems of Axton-Fisher (Giannini Dep. III, p. 9).

63. The August 31, 1942 balance sheet (eight month summary) was prepared by an accounting firm at either Robbins' or Transamerica's request with the purpose of submitting it to stockholders. (Robbins Dep. II, pp. 49–53; Andrews Dep. II, pp. 9–11).

64. Giannini instructed Robbins not to send out the August 31, 1942 report, allegedly because to have done so might have further required an "SEC-like" disclosure, and moreover, selling stockholders might have claimed they had been "unduly influenced" to sell their stock by the audit. (Pl. Giannini No. 13, p. 10; Robbins Dep. II, pp. 49–53; Andrews Dep. II, pp. 9–11).

65. On September 2, 1942, Robbins received an option from Transamerica to purchase 2000 class B shares at certain prices (Def. Andrews No. 8).

66. The option was exercised on May 27, 1943 (Giannini Dep. III, p. 57). (Pl. Trial No. 9).

67. The offer for sale of the 2000 shares was made to Robbins personally by one Lewis and Transamerica acted merely as banker for the transaction (Giannini Dep. III, pp. 46–47).

68. The receipt, by Robbins, of the option for 2000 B shares was not for purposes of investment but was indicative of his realization that those shares would be turned over at an early and substantial profit because,

a. Under the charter, no dividends could be paid upon B shares until all preferred and Class A arrearages had been satisfied (Pl. Trial No. 16).

b. As of December 31, 1942, arrearages on preferred and A shares totalled $1,189,081.50 (Pl. Andrews No. 7–D).

c. Moreover, Giannini admitted that so far as he knew Axton-Fisher was never prepared to pay dividends on the B stock. (Giannini Dep. I, p. 165).

69. Just prior to the issuance of the letter of November 12, 1942, Axton-Fisher's financial position, unknown to stockholders, had improved.

a. Axton-Fisher made an operating profit before taxes and other income of $185,188.29 for the first nine months of 1942 (Pl. Robbins No. 9–I).

b. Transamerica knew of the operating results for the aforesaid period (Andrews Dep. II, p. 24).

70. L. M. Giannini was in a position of authority in Transamerica Corporation, and was responsible for many of Transamerica's decisions regarding Axton-Fisher.

a. Giannini was instrumental in Transamerica's initial purchase of Axton-Fisher stock (Giannini Dep. III, pp. 48–49);

b. Giannini was consulted on virtually all major policy (id. p. 49);

c. Giannini assumed effective control of Transamerica's affairs in regard to Axton-Fisher (Giannini Dep. I, p. 86);

d. At the crucial meeting of the Axton-Fisher directors of June 15, 1943, Philip S. Ehrlich, Transamerica's representative, requested a twenty-four hour adjournment for the sole purpose of consulting Giannini in San Francisco, although both Schimpff and Panario, Transamerica's officials were then present in Louisville;

e. Giannini was given a vote of appreciation by the Board of Transamerica for his "sagacity" in netting for defendant some $9,000,000 on its investment in Axton-Fisher (Def. Giannini No. 1–A, p. 4–5).

71. All evidence pointing toward defendant's intention to dispose of its investment in Axton-Fisher by a sale of stock, is evidence equivalent to an intent to liquidate. Defendant always knew of, and eventually used, the sole feasible method of liquidation and at all time contemplated receiving a profit equal to the full appreciation in value of the tobacco inventory.

72. Circumstances relating to Axton-Fisher during 1942 operated to induce "discouragement" as to the future of that company on the part of stockholders. Among the circumstances were:

a. Failure of recapitalization plans (Pl. Robbins No. 8–B).

b. Published history of diminishing profits (Pl. Andrews No. 11).

c. Unsatisfactory operating future (Harcourt Dep. pp. 1–8; Speed Dep. p. 16).

840

*Findings relating to events surrounding the issuance of the letter of November 12, 1942, by Transamerica Corporation*

73. No purchase of Axton-Fisher stock was made by Transamerica between September 22, 1942, the date of the Cullman purchase (Pl. Giannini No. 13, p. 1) and purchases made under the letter of November 12, 1942 (Pl. Trial No. 9).

74. The purchase of the Cullman shares on September 22, 1942 removed the only apparent dissenter to recapitalization plans, if such plans had been offered for consideration. (Andrews Dep. I, p. 73).

75. On November 2, 1942, Robbins wrote Hillyer Brown, counsel for Transamerica, stating, "Now that the full new line has been released, things are fortunately going a bit too well to be true for Axton-Fisher. I hope the good luck continues." (Def. Robbins No. 4).

76. On November 9, 1942, Transamerica issued special instructions to Axton-Fisher regarding the forwarding of monthly statements and copies of minutes of Board meetings (Pl. Harvey No. 16).

77. Following the receipt of shares turned in by stockholders pursuant to the November 12, 1942 letter, Transamerica held 69.43% control of Axton-Fisher voting stock. (Pl. Clauson No. 3–A, p. 14).

78. Transamerica stipulated that the offer was dependent upon the receipt of 24,000 A shares and 18,000 B shares or such lesser amount as it deemed acceptable. (Pl. Giannini No. 6–A) Transamerica in fact accepted 13,536 Class A shares and 5,707 Class B shares under the offer (Pl. Giannini No. 13, p. 2), representing only 56.4% and 31.7% of the respectively stipulated A and B shares.

79. The letter stated that the offer was to be limited to shares received before the close of business on November 27, 1942 (Pl. Giannini No. 6–A).

a. Defendant accepted shares from stockholders under the offer after that date and solicited purchases by letters in which various closing dates were mentioned such as December 30, 1942 (Pl. Trial No. 30), and January 15, 1943 (Pl. Trial Nos. 25, 26 and 27).

b. An offer was made to a shareholder that his shares be purchased at prevailing market prices on March 20, 1943 (Pl. Trial No. 32).

80. The offer of November 12, 1942 contained a sentence, "Any inquiries regarding the offer may be addressed to us." Defendant had no intention of answering inquiries, and in fact specifically failed to answer inquiries which were addressed to it. (Pl. Trial Nos. 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22).

81. Transamerica's offer of $40 for the A stock was 33⅓% above the prevailing market prices for such stock (Pl. Giannini No. 13, p. 7) and the offer of $12 for B stock was several dollars above the market price for such stock (Admission II, Ex. B).

82. The effect of the apparently generous purchase price, in addition to the conviction held by stockholders that Axton-Fisher prospects were poor and the brief 15-day period apparently allowed for acceptance of the offer, served to stampede selling stockholders into sale.

83. The annual statement of Axton-Fisher for the year 1941 (Pl. Andrews No. 7–C; Pl. Andrews No. 11) was the sole financial report which selling stockholders under the November 12, 1942 offer could rely upon.

84. Stockholders who addressed inquiries to Axton-Fisher were told nothing of the aim and purpose of Transamerica's offer. (Pl. Harvey Nos. 45–A, 45–B, 46–A, 46–B, 47–A, 47–B, 48–A, 48–B, 49–A, 49–B, 50–A, 50–B).

85. Stockholders who inquired of Transamerica about its intentions and plans with regard to Axton-Fisher were told:

a. to consult their broker.

b. to consult Axton-Fisher.

c. in some instances stockholders were merely given copies of the Axton-Fisher 1941 annual statement.

86. No good reason has been given by defendant for making the condition in the offer that such offer would not be binding upon Transamerica unless 24,000 of the A shares and 18,000 of the B shares were tendered.

a. Defendant's explanation that such numbers were specified in order that 66⅔ per cent of the shares would be held and thus enable defendant to recapitalize is unsustainable.

b. The more probable reason for defendant's specification as to the number of shares desired is that that number of shares would have enabled defendant at any time thereafter to liquidate Axton-Fisher tax-free.

*Findings relating to some events subsequent to the November 12, 1942 letter*

87. On December 4, 1942, OPA ceilings were placed upon burley tobacco, thus foreclosing any further appreciation in the value of current crop burley (Def. Trial No. 31).

88. Effective January 8, 1943, purchases of burley tobacco were limited to 90% of historical purchases (Def. Trial No. 35).

89. In early 1943, liquidation of Transamerica's interest was definitely concluded upon.

a. Robbins recommended to Giannini in January 1943 that Axton-Fisher be dissolved (Robbins Dep. I, p. 57; Robbins Dep. II, p. 55; Giannini Dep. III, pp. 17–18).

b. Giannini concurred in the recommendation (Robbins Dep. I, pp. 61–65). (Compare Giannini Dep. III, p. 19; Giannini Dep. I, pp. 50–51).

90. Giannini undertook to authorize one John Hanes to conduct negotiations with P. Lorillard Company (Robbins Dep. II, p. 59; Giannini Dep. I, pp. 50–51; Giannini Dep. III, pp. 17–18).

91. Negotiations were opened with Philip Morris on March 16, 1943 (Pl. Giannini No. 13, p. 35).

92. Shortly after the opening of the Philip Morris negotiations, Transamerica was advised that Philip Morris would not purchase Axton-Fisher stock because to have done so would have had the purchasing company subjected to a prohibitive tax (Pl. Brauberger No. C, p. 3, Pl. Brauberger No. D and Def. Trial No. 15).

93. Transamerica immediately undertook the necessary mechanics to enable itself to most profitably dispose of its investment in Axton-Fisher.

a. Between March 29 and April 9, 1943, Transamerica converted its A shares into B shares (Pl. Trial No. 9).

b. The decision of Transamerica to "suggest" the call of the remaining A shares was made at that time (Andrews Dep. II, p. 36).

c. In reply to letters received by defendant, inquiring about the reason for such conversion (Pl. Andrews Nos. 6–A, 6–B, 6–C), Transamerica utterly failed to meet the direct inquiry (Pl. Andrews No. 6–E) and failed to reply to following inquiries (Pl. Andrews No. 6–G).

d. This conversion substantially increased defendant's profits upon the ultimate liquidation of Axton-Fisher.

94. In early April 1943, the impracticability of a stock sale by Transamerica was clearly apparent.

a. Robbins visited San Francisco between April 13, and April 16, 1943 (Pl. Harvey No. 27, No. 27–A).

b. On that trip, Robbins conveyed to Giannini Philip Morris' counter proposal to purchase only assets (Robbins Dep. II, pp. 75, 111).

c. Giannini was informed of Philip Morris' cogent tax reasons for not accepting a sale of stock (Robbins Dep. II, pp. 69–76).

95. On April 30, 1943, at Transamerica's "suggestion" the Board of Directors of Axton-Fisher called the outstanding A shares for redemption (Andrews Dep. I, pp. 94–95) (Pl. Robbins No. 12).

96. Negotiations continued with Philip Morris regarding the valuation of the tobacco inventory (Rec. pp. 148–151; Rec. pp. 171–172).

97. Following the date of the call, Transamerica held 86.2% of Axton-Fisher stock (Pl. Trial No. 9).

98. Under the provisions of I RC 112–B–6, the ownership of more than 80% of Axton-Fisher stock would enable Transamerica to receive assets of Axton-Fisher under a tax-free dissolution.

99. Although Transamerica later in fact manipulated its investment so as to technically disqualify itself under the tax

free provision of IRC 112–B–6, in order to use up a capital loss carry-over (Andrews Dep. II, p. 21, pp. 22–23), nevertheless Transamerica had placed itself in a position that, if the carry-over had been used up in another manner, it could have received Axton-Fisher assets under a tax free dissolution (Id. pp. 37–38).

100. On April 12, 1943, Philip Morris was prepared to pay $13,500,000 for the plant and assets of Axton-Fisher (Pl. Brauberger No. D).

101. On July 31, 1943, Axton-Fisher showed an operating loss for the first seven months of 1943 equal to $293,305.38 (Pl. Trial No. 65) and for the year 1943, showed a profit of only $144,896.65 (Pl. Andrews No. 7–A).

102. On August 9, 1943, a valuation was prepared which showed the B shares to be then worth $91.75. This valuation was based upon the value of tobacco as of December 31, 1942 of $17,000,000. Giannini suggested that a fair price for the stock then was $120 per share (Pl. Andrews No. 21).

103. Transamerica was temporarily precluded from carrying out its intention to liquidate Axton-Fisher:

a. On June 16, 1943, the April 30, 1943 resolution was amended by the Axton-Fisher Board, so that outstanding A shares were not mandatorily redeemed (Pl. Andrews No. 14).

b. Transamerica threatened the Axton-Fisher Board for changing the resolution (Pl. Dawson No. 2, p. 3).

c. Immediately, suit was instituted to determine the validity of the resolution of June 16, 1943 (Def. Brannon No. 5).

d. On July 15, 1943, decision of Kentucky Court that the April 30, 1943 resolution was binding, 295 Ky. 226, 173 S.W.2d 377, 148 A.L.R. 834.

e. On July 16, 1943, Geller complaint filed, alleging that defendant had caused the redemption of the A stock to reap a greater profit through merger or liquidation.

f. On December 31, 1943, District Court decision in the Geller case. 53 F.Supp. 625.

104. On April 27, 1944, Andrews recommended dissolution of Axton-Fisher (Pl. Giannini No. 12–B). This decision was given Axton-Fisher on May 25, 1944 (Pl. Andrews No. 18–B).

105. Dissolution was accomplished by distribution of Axton-Fisher assets and sale of a large part of those assets to Philip Morris for $8,925,000, on June 20, 1944 (Def. Trial No. 4, p. 7).

106. On June 21, 1944, Axton-Fisher distributed approximately 17,000,000 lbs. of tobacco to Transamerica as a liquidating dividend; on June 26, 1944 Transamerica received an offer from Philip Morris for that tobacco of $9,742,817.92 (Andrews Dep. III, p. 3).

107. The profit to Transamerica in terms of dollars per share was approximately $100.65 less the original cost of the shares which averaged something over $12 per share (Pl. Giannini No. 13, pp. 29–30), which profit netted Transamerica something over $9,000,000 (Def. Giannini No. 1–A, p. 4).

General Findings of Fact

108. William S. Speed, Isaac Harcourt, Rebecca W. Barry (?), Edith Hall Merrill, Noel Hall Clark and Caroline E. Veatch sold the Axton-Fisher A and B shares owned by them and held as trustee, to Transamerica pursuant to the offer of November 12, 1942. (Pl. Register No. 4 and No. 5).

109. Neither Transamerica nor Axton-Fisher disclosed the increased earnings of Axton-Fisher prior to the November 12, 1942 offer.

110. Plaintiffs did not know of the increased earnings of Axton-Fisher, prior to the November 12, 1942 offer. (Harcourt Dep. pp. 1–6; Speed Dep. p. 17).

111. Neither Transamerica nor Axton-Fisher disclosed the increased tobacco inventory prior to the November 12, 1942 offer.

112. Plaintiffs did not know of the increased value of the tobacco inventory prior to November 12, 1942.

a. Notwithstanding the newspaper publication of higher prices paid for tobacco

in 1941 and 1942 (Admission I, III) plaintiffs did not know of the improvement in value of the tobacco inventory of Axton-Fisher. (Speed Dep. pp. 7, 9–12; compare id., pp. 25–29; Harcourt Dep. p. 7, p. 18–19; compare Wilson Dep. p. 5).

b. Granting vague knowledge by investors that higher prices were being paid for leaf tobacco in 1941 and 1942, in the absence of knowledge that liquidation or disposal of Axton-Fisher was in prospect (Speed Dep. p. 38); Harcourt Dep. p. 7), plaintiffs and other investors, as non-tobacco men, did not realize any potential significance in the increased tobacco inventory.

113. Transamerica realized the profitable disposability of its investment in Axton-Fisher prior to the offer of November 12, 1942.

114. Transamerica decided, prior to the issuance of the November 12, 1942 letter, to dispose profitably of its investment in Axton-Fisher by liquidation or otherwise, and that such decision was not disclosed to stockholders of Axton-Fisher.

115. Transamerica intended that stockholders in accepting its offer of November 12, 1942, should rely upon the annual statement of Axton-Fisher for the year 1941.

116. Transamerica intended that stockholders in accepting its offer of November 12, 1942, should not be fully advised about (a) the increase in earnings of Axton-Fisher in 1942, (b) the increased value of the tobacco inventory, and (c) Transamerica's purpose to profitably dispose of its investment in Axton-Fisher by liquidation or otherwise.

## Conclusions of Law

1. At the time Transamerica made its offer to buy stock from Complainants and others, it was required, under Rule X–10B–5 of the Securities and Exchange Commission, to disclose any and all material facts which would be likely to influence persons receiving the offer, in their decision to accept or decline the offer made.

2. Defendant's failure upon sending the letter of November 12, 1942, through the United States mails, to disclose the increased earnings, the increased value of the tobacco inventory, and the ultimate purpose of Transamerica to capture for itself the greatly increased value of the tobacco inventory constitute a violation of Rule X–10B–5 of the Securities and Exchange Commission.

3. In making an offer of 33⅓% above the current market price, defendant impliedly represented that the price offered was a fair price at that time.

4. The inclusion of the condition in defendant's offer, that the offer was to be limited to stockholders of record on October 31, 1942, constitutes one of the badges of fraud which indicate defendant's plan to mislead plaintiffs and other stockholders.

5. The inclusion of the condition in defendant's offer that the offer was to be limited to 24,000 shares of A stock, and 18,000 shares of B stock "or such lesser number as is acceptable" constitutes one of the badges of fraud which indicate defendant's plan was to mislead plaintiffs and other stockholders.

6. Under the existing state of proof, the burden is upon defendant to show that at the time it sent out its offer, it intended to retain its interest in Axton-Fisher as a going concern.

7. Under the existing state of proof, the burden is upon defendant to show that at the time it sent out its offer, the prices offered were fair prices for the stock.

8. Acceptance of the offer by complainants, without knowledge of material facts known to defendant, and the consequent sale of stock to defendant for an inadequate price, entitled complainants and others to full damages sustained through such sale.

## Zahn v. Transamerica: CA 490.

1. Pursuant to order based upon a stipulation of the parties, the instant case was tried together with the Speed and Friedman actions. By the stipulation it was provided that all depositions, answers to interrogatories, accompanying exhibits and admissions in any of the three cases be deemed to have been made in all. A single

record was made of all three cases. Thereafter the three actions were tried together to the court.

The substance of the first two causes of action in the Zahn complaint is tersely set forth in Zahn v. Transamerica Corp., 3 Cir., 162 F.2d 36, 38 en banc. There, Chief Judge Biggs wrote:

"Zahn, a holder of Class A common stock of Axton-Fisher Tobacco Company, a corporation of Kentucky, sued Transamerica Corporation, a Delaware company, on his own behalf and on behalf of all stockholders similarly situated, in the District Court of the United States for the District of Delaware. His complaint as amended asserts that Transamerica caused Axton-Fisher to redeem its Class A stock at $80.80 per share on July 1, 1943, instead of permitting the Class A stockholders to participate in the assets on the liquidation of their company in June, 1944. He alleges in brief that if the Class A stockholders had been allowed to participate in the assets on liquidation of Axton-Fisher and had received their respective shares of the assets, he and the other Class A stockholders would have received $240 per share instead of $80.80. Zahn takes the position that he has two separate causes of action, one based on the Class A shares which were not turned back to the company for redemption; another based on the shares which were redeemed. He prayed the court below to direct Transamerica to pay over to the shareholders who had not surrendered their stock the liquidation value and to pay over to those shareholders who had surrendered their stock the liquidation value less $80.80. Transamerica filed a motion to dismiss. The court below granted the motion holding that Zahn had failed to state a cause of action. See 63 F.Supp. 243. He appealed.

"The facts follow as appear from the pleadings, which recite provisions of Axton-Fisher's charter. Prior to April 30, 1943, Axton-Fisher had authorized and outstanding three classes of stock, designated respectively as preferred stock, Class A stock and Class B stock. Each share of preferred stock had a par value of $100 and was entitled to cumulative dividends at the rate of $6 per annum and possessed a liquidation value of $105 plus accrued dividends. The Class A stock, specifically described in the charter as a 'common' stock, was entitled to an annual cumulative dividend of $3.20 per share. The Class B stock was next entitled to receive an annual dividend of $1.60 per share. If further funds were made available by action of the board of directors by way of dividends, the Class A stock and the Class B stock were entitled to share equally therein. Upon liquidation of the company and the payment of the sums required by the preferred stock, the Class A stock was entitled to share with the Class B stock in the distribution of the remaining assets, but the Class A stock was entitled to receive twice as much per share as the Class B stock.

"Each share of Class A stock was convertible at the option of the shareholder into one share of Class B stock. All or any of the shares of Class A stock was callable by the corporation at any quarterly dividend date upon sixty days' notice to the shareholders, at $60 per share with accrued dividends. The voting rights were vested in the Class B stock but if there were four successive defaults in the payment of quarterly dividends, the class or classes of stock as to which such defaults occurred gained voting rights equal share for share with the Class B stock. By reason of this provision the Class A stock had possessed equal voting rights with the Class B stock since on or about January 1, 1937.

"On or about May 16, 1941, Transamerica purchased 80,160 shares of Axton-Fisher's Class B common stock. This was about 71.5% of the outstanding Class B stock and about 46.7% of the total voting stocks of Axton-Fisher. By August 15, 1942, Transamerica owned 5,332 shares of Class A stock and 82,610 shares of Class B stock. By March 31, 1943, the amount of Class A stock of Axton-Fisher owned by Transamerica had grown to 30,168 shares or about 66⅔% of the total amount of this stock outstanding, and the amount of Class B stock owned by Transamerica had increased to 90,768 shares or about 80% of the total outstanding. Additional shares of Class B stock were acquired by Trans-

america after April 30, 1943, and Transamerica converted the Class A stock owned by it into Class B stock so that on or about the end of May, 1944 Transamerica owned virtually all of the outstanding Class B stock of Axton-Fisher. Since May 16, 1941, Transamerica had control of and had dominated the management, directorate, financial policies, business and affairs of Axton-Fisher. Since the date last stated Transamerica had elected a majority of the board of directors of Axton-Fisher. These individuals are in large part officers or agents of Transamerica.

"In the fall of 1942 and in the spring of 1943 Axton-Fisher possessed as its principal asset leaf tobacco which had cost it about $6,361,981. This asset was carried on Axton-Fisher's books in that amount. The value of leaf tobacco had risen sharply and, to quote the words of the complaint 'unbeknown to the public holders of * * * Class A common stock of Axton-Fisher, but known to Transamerica, the market value of * * * [the] tobacco had, in March and April of 1943, attained the huge sum of about $20,000,000.'

"The complaint then alleges the gist of the plaintiff's grievance, viz., that Transamerica, knowing of the great value of the tobacco which Axton-Fisher possessed, conceived a plan to appropriate the value of the tobacco to itself by redeeming the Class A stock at the price of $60 a share plus accrued dividends, the redemption being made to appear as if 'incident to the continuance of the business of Axton-Fisher as a going concern,' and thereafter, the redemption of the Class A stock being completed, to liquidate Axton-Fisher; that this would result, after the disbursal of the sum required to be paid to the preferred stock, in Transamerica gaining for itself most of the value of the warehouse tobacco. The complaint further alleges that in pursuit of this plan Transamerica, by a resolution of the Board of Directors of Axton-Fisher on April 30, 1943, called the Class A stock at $60 and, selling a large part of the tobacco to Phillip-Morris Company,

Ltd., Inc., together with substantially all of the other assets of Axton-Fisher, thereafter liquidated Axton-Fisher, paid off the preferred stock and pocketed the balance of the proceeds of the sale. Warehouse receipts representing the remainder of the tobacco were distributed to the Class B stockholders.

"Assuming as we must that the allegations of the complaint are true, it will be observed that agents or representatives of Transamerica constituted Axton-Fisher's board of directors at the times of the happening of the events complained of, and that Transamerica was Axton-Fisher's principal and controlling stockholder at such times."

The substance of the third cause of action is that the resolution of April 30, 1943, calling the Class A stock for redemption, is invalid because the directors who voted in favor of the resolution were misled and deceived by Transamerica into voting for the resolution in the belief that the redemption was requested by Transamerica in furtherance of a plan to simplify the capital structure of Axton-Fisher as a going concern and with a view to permanent continuance of its regular business, whereas Transamerica actually requested the resolution solely for the purpose of realizing the huge appreciation of the market price of the leaf tobacco inventory by dissolution of Axton-Fisher in the forseeable future and the liquidation of its assets.

The basic factual issues in the Zahn and Friedman cases are, 1. whether defendant Transamerica caused the directors of Axton-Fisher to call on April 30, 1943, the Class A stock for redemption; 2. whether at that time defendant exercised control over Axton-Fisher's directors; 3. whether in causing the call to be made Transamerica planned to capture for itself the inventory appreciation of the leaf tobacco, either through liquidation or through sale of all of Axton-Fisher's remaining B stock to one of the "Big Six"[20] cigarette manufacturers who might purchase such stock

---

20. American Tobacco Company; Liggett & Myers Tobacco Company; P. Lorillard Tobacco Company; Philip-Morris & Co., Ltd.; R. J. Reynolds Tobacco Company; C. Stephens Bros.

as a means of acquiring Axton-Fisher's inventory; 4. whether, irrespective of Transamerica's control of Axton-Fisher's directors, defendant mislead Axton-Fisher's directors to make such call on April 30, 1943; and 5. whether the Class A stockholders who delivered their shares for redemption and received a payment of $80.80 a share did so in ignorance of the fact that Axton-Fisher's leaf tobacco inventory had greatly increased in market value and that the purported redemption of the Class A stock was not in contemplation of continuing the business life of Axton-Fisher but was in furtherance of Transamerica's intent to capture for itself the large appreciation in the market value of the leaf tobacco inventory.

Prior to trial I granted defendant's motion to dismiss the complaint. D.C.Del., 63 F.Supp. 243. The Court of Appeals reversed my judgment of dismissal of the Zahn complaint. Thereafter, defendant petitioned the Court of Appeals for rehearing. This was granted and oral argument was had before the full Court, consisting of Chief Judge Biggs, Circuit Judges Maris, Goodrich, McLaughlin, O'Connell and Kalodner. 162 F.2d 36. The Court affirmed its previous decision and, in reversing my judgment, held that, if the allegations of the Zahn complaint were true, Transamerica, as the majority and dominant stockholder, occupied a fiduciary relationship toward all minority stockholders, including all the Class A stockholders of Axton-Fisher; and if the purpose of the call for redemption of the Class A stock was the plan alleged in the Zahn first and second causes of action, Transamerica was guilty of a breach of its fiduciary obligations toward the Class A stockholders of Axton-Fisher; and finally, that such breach made Transamerica accountable for all its gain as for all loss suffered by the Class A common stockholders by reason of such breach. The Court of Appeals decision clearly reaches out to protect both the Class A common stockholders who have failed to surrender their shares for redemption and those who have delivered their shares for redemption and received the redemption payment.

Under the view which I have taken in the Speed case, supra, it does not become necessary to treat the Zahn third cause of action or to test its sufficiency in law and to evaluate the factual proofs in support of it. In fact, in this case, as in Friedman v. Transamerica, CA 468, infra, it is unnecessary to retell the Giannini-Robbins story. Before making formal findings in this case and the Friedman case, it is sufficient to note that Transamerica, at the time of the call on April 30, 1943, controlled through Robbins Axton-Fisher's board of directors and by such control caused those directors to call the Class A stock for redemption. It was, as described by Chief Judge Biggs, a "puppet-puppeteer" relationship in which those directors did not "exercise an independent judgment" [162 F.2d 46.] until it was too late, and they then attempted to undo a corporate action which at its inception they did not fully realize would have such an impact on the shareholders of the Class A stock. I do not find in this record any evidence that the directors of Axton-Fisher were servile or in any sense willing to follow an improper proposal made by Transamerica. For example, the record shows that Judge Dawson was a man of high integrity and ability. He stands as a symbol of all the other directors when he assumed that any request coming from Transamerica through Robbins should be deemed proper and to be complied with, so long as there was no obvious impropriety.

It is further established that in exercising its control to cause the directors of Axton-Fisher to call the Class A stock for redemption, Transamerica did not in good faith contemplate that Axton-Fisher should continue its corporate existence; but, on the contrary, the call was resorted to as a step in the furtherance of a plan to capture for Transamerica the greater bulk of the tobacco inventory appreciation through dissolution and liquidation of Axton-Fisher. The testimony of Judge Dawson establishes most convincingly the fact that Transamerica in requesting, through Robbins, that the redemption call be rushed through on April 30, 1943, lead the board to believe

and assume that Transamerica was in good faith planning to continue Axton-Fisher and restore it to financial soundness by procuring additional equity capital through some form of a recapitalization plan. The understanding, which I have noted in the Speed case, supra, between Giannini and Robbins, which involved the contemplated liquidation of Axton-Fisher in the foreseeable future, was not disclosed to the directors of Axton-Fisher or to the other public shareholders. To further illustrate Judge Dawson's state of mind, I simply quote from PX. 2 (Dawson Dep.):

"Judged by tobacco sales during the last season, it is my information that there is a tremendous enhancement over cost in the Company's tobacco inventory, and those most directly interested could not be reasonably expected to dissipate this profit in operation of the company under present conditions. However, if liquidation, merger or sale of substantially all of the assets in the immediate future is contemplated by those in control, it would seem that *equity and fair dealing* would require that the holders of Class A stock, well in advance of any redemption thereof, should be given full information as to the probable profit which would result from liquidation, merger or sale of the company's assets, and given an opportunity to elect between surrendering their stock for redemption or exchanging it for Class B common stock, enabling them, by such exchange, to participate in any benefits of liquidation." Again, to quote from his deposition (pp. 49-50):

"Would you have voted for the redemption of the Class A stock if you had known the Philip-Morris negotiations had been terminated on April 30, 1943?

"A—I probably would if I hadn't any information they were fixing to liquidate, and if I still believed what I had been lead to believe, that liquidation was out of the picture—that this company wanted to be kept running. I think any man with the most elemental sense of fairness and morality, knowing the rights of the Class A stockholders, would refuse to vote to call it on the eve of liquidation, when by the slightest investigation he could find that on the basis of the fair market value of the inventory liquidation would yield the Class A stockholders almost double what they would get by the redemption route."

2. Transamerica urges that the Supreme Court of Kentucky in Taylor v. Axton-Fisher Tobacco Co., 295 Ky. 226, 173 S.W.2d 377, 147 A.L.R. 834, decided issues which are res judicata against the plaintiffs in the Friedman and Zahn cases. It is said under the full faith and credit clause of the United States Constitution I am bound by the decision of the Kentucky Court; and, in any event, defendant, here, should win because under Erie Railroad Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, the law of Kentucky should control. As the Kentucky Court has construed the Axton-Fisher charter to authorize a redemption of the Class A stock for the exclusive benefit of the Class B stockholders even if liquidation was planned, defendant argues I am bound to follow that decision. I think the decision of Chief Judge Biggs in Zahn v. Transamerica Corp., 3 Cir., 162 F.2d 36, sufficiently disposes of this point. Moreover, there is no language in the opinion in the Taylor case which in any way suggests that the Kentucky Court was considering any *plan* of Transamerica to liquidate Axton-Fisher or any domination or control by Transamerica in connection with such a plan. As stated, our Court of Appeals in the Zahn case properly defined the extent of the Taylor decision and held that it did not decide the question. I likewise conclude that it did not decide the question involved in this, the Zahn case and the Friedman case. In fact, there is neither identity nor privity of parties between this action and the Taylar action and hence the Taylor judgment is not res judicata nor binding here.

The master or basic facts which have already been found in Speed v. Transamerica Corp., supra, are applicable to both the Zahn and Friedman cases. However, I think it necessary to make several additional specific findings in these two cases as to the facts which are particularly drawn into their cause of action.

## Findings of Fact

1. All three causes of action here are brought as representative class actions on behalf of the plaintiff and on behalf of all Class A Common stockholders of Axton-Fisher who may be owners of Class A Common shares or who surrendered their shares for redemption pursuant to the call. The first and third causes of action are brought on behalf of all Class A Common stockholders who own their shares and who have not delivered them for redemption; and the second and third causes of action are brought on behalf of the Class A Common stockholders who delivered their shares for redemption.

2. The total number of Class A Common shares represented by plaintiff has not been determined by me.

3. On July 23, 1943 and August 10, 1943, plaintiff Zahn purchased 235 shares of Axton-Fisher's Class A Common stock, and this plaintiff still owns 20 shares, the remaining 215 shares having been delivered for redemption.

4. Prior to April 30, 1943, Robbins had advised the other members of the Axton-Fisher Board that Transamerica was negotiating for the sale to Philip-Morris Tobacco Company, Ltd., of the Axton-Fisher stock owned by it.

5. Robbins did not advise the other members of the Axton-Fisher Board at any time on or before April 30, 1943 that the negotiations for the sale to Philip-Morris Tobacco Company, Ltd., of the Axton-Fisher stock owned by Transamerica, had collapsed.

6. Robbins did not advise the other members of the Axton-Fisher Board at any time on or before April 30, 1943 that just prior to April 30, 1943, Philip-Morris Tobacco Company, Ltd., had definitely determined that it would not buy the Axton-Fisher stock owned by Transamerica.

7. Robbins did not advise the other members of the Axton-Fisher Board at any time on or before April 30, 1943 that defendant, during the summer of 1942, had determined to capture the large appreciation in inventory value of the tobacco.

8. Robbins did not advise the other members of the Axton-Fisher Board at any time on or before April 30, 1943 that defendant, in January 1943, had determined to capture for itself the inventory profit of Axton-Fisher Tobacco Company by sale of the capital stock or by liquidation, merger, consolidation or sale of substantially all of the assets of Axton-Fisher Tobacco Company.

9. Robbins did not advise the other member of the Axton-Fisher Board at any time on or before April 30, 1943 that defendant had determined that the only practical means by which the inventory profit in Axton-Fisher Tobacco Company could be captured was by a liquidation of Axton-Fisher.

10. On April 30, 1943 defendant caused the Board of Axton-Fisher to call for redemption on July 1, 1943, the 15,397 shares of Class A common stock still outstanding at $60. per share plus accrued dividends of $20.80, and defendant lent to Axton-Fisher the necessary funds for the purpose.

11. Defendant knew and intended the Board of Directors of Axton-Fisher when it called the Class A stock on April 30, 1943, should do so on the assumption that it was for the purpose of improving the capital structure of the company as a going concern.

12. The Board of Directors of Axton-Fisher, when it called the Class A common stock on April 30, 1943, was doing the bidding of Transamerica.

13. Neither the plaintiff nor any of the other holders of the Class A common stock of Axton-Fisher, who still own their shares, and who have not delivered them for redemption, nor the Class A common stockholders who, on or after July 15, 1943, delivered their shares for redemption, had knowledge prior to May 31, 1944 of any of the facts aforementioned relating to said fraud of the defendant upon the Class A common stockholders or relating to said deception practiced by the defendant on or about April 30, 1943 on Axton-Fisher's directors in connection with said call.

14. The purpose of defendant in causing the call for redemption of the Class A

common stock of Axton-Fisher was to advantage itself by liquidation, merger, consolidation or sale of substantially all of the assets of Axton-Fisher.

15. Subsequently, defendant did advantage itself by virtue of the redemption of Class A common stock of Axton-Fisher through liquidation.

### Conclusions of Law

1. Each of the three causes of action is a representative class suit. The first cause of action and the third cause of action (insofar as the third cause of action relates to all shares of the Class A common stock which have not been delivered for redemption and which are still held by their owners) are maintainable on behalf of all holders of Axton-Fisher's Class A common stock who have not delivered all of their shares for redemption. The second cause of action and the third cause of action (insofar as the third cause of action relates to all Class A common shares which were delivered for redemption) are for the benefit of all Class A common stockholders who delivered for redemption.

2. Defendant, by reason of its control over the board of directors of Axton-Fisher, was under a fiduciary obligation to the minority stockholders of Axton-Fisher to act with fairness towards them, and in causing the directors of Axton-Fisher to call the Class A common stock for redemption on April 30, 1943, defendant violated its fiduciary obligations to all the Class A common stockholders.

3. As to the first cause of action and as to so much of the third cause of action as relates to all shares of the Class A common stock which have not been delivered for redemption, the defendant is accountable to all of the Class A common stockholders who still own their shares. As to the second cause of action and as to so much of the third cause of action as relates to all Class A common shares which were delivered for redemption, defendant is accountable to all such Class A common stockholders who delivered their shares for redemption.

4. An appropriate judgment shall be entered herein and in the Friedman action, as stated below, which will adjudge and direct defendant to pay the total amount for which defendant is accountable, and the judgment will provide for the payment of said amount, after deduction of such counsel fees, disbursements and expenses as shall be allowed by the court, to the respective Class A common stockholders.

### Friedman v. Transamerica; CA 468.

As this action is a companion case to Zahn v. Transamerica Corp., supra, little can be added to what was said in that case and the Speed case, supra. Any discussion of specific fact problems would show, as in the other cases, that Transamerica was exercising its position as controlling stockholder when it caused the board of Axton-Fisher to call the A stock for redemption and that Robbins was the alter ego of Transamerica in the conduct of the affairs of Axton-Fisher. Plaintiffs, here, do urge, however, that there is abundant proof in the record showing that when the Class A stock was caused to be called by Transamerica it intended to liquidate, merge, consolidate or sell Axton-Fisher's assets. I have already discussed the other proofs in the case besides the testimony of Robbins vis-a-vis Giannini. The pivotal fact which I find in this case is the same as I found in the related cases, i. e., there can be no question that, prior to the redemption resolution of April 30, 1943, Axton-Fisher was destined for liquidation.

As to the law, the duties of the defendant Transamerica and the circumstances of this case are, as in the Zahn case, clearly set forth in the two opinions of the Court of Appeals in the Zahn case. And, as stated by the Court of Appeals, this, too, is a spurious class action.

I adopt for the purpose of this particular case as many of the findings of the Speed case as are appropriate and I adopt in toto the findings in the Zahn case, supra.

Both in this case and in the Zahn case an attack was made on the rights of particular plaintiffs to recover or even maintain the action and, as to those plaintiffs that may maintain the action, as to the amount of damages they should be per-

mitted to recover. The amount of damages to be awarded and the persons to whom the judgment shall run I leave for the determination of a special master. I shall attempt to act promptly on his report when it is filed. In the interim if plaintiffs need protection by the entry of an appropriate decree I shall entertain such relief as is consistent with the opinions and findings as set forth above.

## Appendix I

Pursuant to orders of the Court and a stipulation between counsel at trial, a decision on defendant's objections to the admissibility of certain evidence was reserved.

1. Exhibits Introduced at Trial. These exhibits are letters between Axton-Fisher, Transamerica and 18 stockholders of Axton-Fisher, the dates of the letters ranging from November 16, 1942 to March 27, 1943. The letters can only have pertinency to the Speed case. I have read all of the letters. They have little, if any, probative value. However, they do deal with the transaction which is under judicial scrutiny. While they may lack high evidentiary competency, relevancy and materiality, I see no reason to sustain defendant's objection. The writings are in the record and should, in my opinion, remain there for examination by the Court of Appeals.

2. Exhibits Introduced During Depositions. I make the same comment with respect to these writings as has just been immediately made above with respect to the exhibits introduced at trial.

3. Objection to the Robbins Deposition Testimony. All objections to the Robbins testimony are overruled.

4. Giannini Deposition Testimony. There is no merit taken to the objections as to Giannini's testimony.

5. Andrews Deposition Testimony. The objections here are based on hearsay and the asking of hypothetical questions. An examination of the deposition shows no prejudice in permitting this testimony in. Hence, the objections are overruled.

6. Dawson Deposition Testimony. Here, again, objections are made on the grounds of hearsay. For the reason immediately stated above, these objections will be overruled.

7. Axton Deposition Testimony. Same ruling.

## Appendix II

### Dramatis Personae

Identification of Persons Appearing in Record of Related Cases

W. L. Andrews—Vice-President and Treasurer of Transamerica, and the corporate officer actively in charge of the Axton-Fisher investment.

Edwin D. Axton—Former President and Director of the Axton-Fisher Tobacco Company, and a man who knew a great deal about the cigarette and tobacco business; also a director of Axton-Fisher from August 22, 1941 to July 31, 1943.

R. J. Barham—Employee in leaf department of Axton-Fisher during period that Transamerica was stockholder of that company; after dissolution of Axton-Fisher, an employee of Philip Morris & Co., Ltd., Inc.

Rebecca Barry—A plaintiff in this case, did not appear at the trial, nor was her deposition ever taken.

W. C. Bethea—A tobacco man since 1913; employed by Imperial Tobacco Co., then R. J. Reynolds Tobacco Co., employed by Brown-Williamson Tobacco Co. from 1926–1938, where for 6 years he was factory manager in Louisville and for 6 years in charge of leaf buying. After 1938 employed by Axton-Fisher in charge of manufacturing, later in charge of both manufacturing and leaf buying.

S. E. Brannon—Employed by Axton-Fisher since 1920; Secretary of that company since 1935; a director of Axton-Fisher from February 26, 1942 until time of dissolution.

George P. Brauburger—General Counsel of Philip Morris & Co., Ltd.

Dr. Leroy Brooks—A practicing physician of San Francisco, who treated L. M. Giannini.

Hillyer Brown—Partner of law firm of Orrick, Dahlquist, Neff, Brown & Herrington of San Francisco; attorney for Transamerica.

O. H. Chalkley—President of Philip Morris.

Henning Chambers—A retired capitalist, one of Louisville's leading citizens; director of Axton-Fisher until his resignation on July 2, 1941.

Noel Hall Clark—A plaintiff in this case; resident of Philadelphia and sister of Edith Hall Merrill.

M. B. Clawson—Manager of San Francisco office of Ernst & Ernst, auditors for Transamerica.

W. R. Cobb—Vice-President of Citizens Union National Bank, which was subsequently amalgamated or merged with The Fidelity and Columbia Trust Company, to form the Citizens Fidelity Bank and Trust Company.

Joseph F. Cullman, Jr.—A capitalist carrying on business in New York, whose primary interest was in tobacco stocks; a director of Axton-Fisher until his resignation on February 26, 1942. He and his associates owned approximately 20% of the Class A stock of Axton-Fisher until mid-September 1942.

Charles I. Dawson—Former U. S. District Judge in Kentucky, member of law firm of Woodward Dawson & Hobson; actively engaged in legal matters for Axton-Fisher since 1939 or 1940; a director of Axton-Fisher from July 2, 1941 to July 31, 1943.

Philip S. Ehrlich—An attorney of San Francisco.

J. M. Fisher—Assistant Vice-President of Bank of America N. T. & S. A.

L. Mario Giannini—President of Bank of America N. T. & S. A., member of board of directors of Transamerica; owned 4000 or 5000 shares of Transamerica directly and had an interest in a trust owning about 20,000 shares.

William S. Grant—President of Transamerica until his death March 25, 1941.

Mrs. Christine Collings Hall—Mother of Edith Hall Merrill and Noel Hall Clark, plaintiffs in this case.

Paul F. Halloran—A certified public accountant and partner of Lybrand, Ross Bros. & Montgomery, who were the auditors for Axton-Fisher.

Isaac Harcourt—A plaintiff in this case; resident of Louisville.

Mrs. Mary Harvey—An employee of Philip Morris in Louisville, in charge of the records of Axton-Fisher.

Wirt H. Hatcher—Vice-President of Philip Morris since 1936, whose chief function was the purchase of leaf tobacco.

A. E. Heston—A tax accountant employed by Transamerica since 1938.

Leonard G. Hunt—Of New Canaan, Conn.; employed by Transamerica to devise a plan of recapitalization for Axton-Fisher which would be acceptable to board of directors and stockholders, prior to Transamerica's purchase of Axton-Fisher B stock.

Ery Kehaya—An investment banker in Louisville; director of Axton-Fisher until his resignation July 27, 1943.

Robert A. Magowan—A director of Axton-Fisher elected August 22, 1941.

Edith Hall Merrill—A plaintiff in this case; resident of Washington, D. C., sister of Noel Hall Clark.

Malcolm P. McLellan—Assistant Secretary of Transamerica.

Squire Ogden—A prominent Louisville attorney; director of Axton-Fisher from January 25, 1941 to August 11, 1941.

George J. Panario—Chairman of the Board of General Metals Corporation (in which Transamerica owned controlling interest); Chairman of the Board of Enterprise Engine & Foundry Company; Chairman of the Board of the Capital Company (in both of which Transamerica owned 100% stock interest).

C. Palmer Parker—Resident of Louisville and President and a director of Axton-Fisher until his resignation September 5, 1941.

John S. Pearson—A director of Axton-Fisher from January 25, 1941 to August 22, 1941.

F. B. Register—Assistant Treasurer and in charge of stock transfer department of Citizens Fidelity Bank & Trust Co., which

852

was formerly known as Fidelity and Columbia Trust Co.; employed by bank under both names for 23 years.

Carl B. Robbins—Former associate professor at Stanford University; former consulting economist for Spreckels Sugar Company; former first vice-president of California & Hawaii Sugar Refining Company; at one time consulting economist for Bank of America N. T. & S. A. (only from summer until fall of 1938, when he returned to Dept. of Agriculture). Immediately prior to his employment by Axton-Fisher, he was president of Commodity Creditor Corporation, a government corporation. Elected a director and chairman of the Board of Axton-Fisher May 27, 1941; elected President of Axton-Fisher September 5, 1941; resigned as President and a director of Axton-Fisher effective August 9, 1943.

Charles H. Schimpff—Assistant Vice-President of Transamerica; later Vice-President of Transamerica; a director of Axton-Fisher from July 27, 1943 to April 29, 1944.

Russell G. Smith—A Vice-President of the Bank of America N. T. & S. A.

William S. Speed—A plaintiff in this case; a capitalist of Louisville; chairman of the board, a director and largest stockholder of Louisville Cement Company; chairman of the board, a director and second largest stockholder of Black Star Coal Company; a director of the Louisville Textile Company; a director of Louisville Realty Association; formerly a director of the National Bank of Kentucky.

Jesse W. Tapp—Vice-President and member of General Finance Committee of Bank of America N. T. & S. A.; elected a director of Axton-Fisher on July 31, 1943; assumed office of President of Axton-Fisher August 10, 1943; continued in both offices until April 1, 1945; prior to his employment by Axton-Fisher he had held a number of important positions in the Department of Agriculture and at one time had been president of the Federal Surplus Commodities Corporation, a director of the Commodity Credit Corporation and a director of the Federal Crop Insurance Corporation; Associate Food Administrator from March to June, 1943.

Otis T. Turner—A broker of Louisville; accountant executive of Merrill Lynch, Pearce, Fenner & Beane; formerly with W. L. Lyons & Co. for three years and Henning Chambers & Co. for 21 years.

Caroline E. Veatch—A plaintiff in this case; resident of Port Washington, Long Island, N. Y.

C. A. Vollmer—Treasurer of Axton-Fisher until spring of 1944.

J. C. Williams—Former co-manager of Brown-Williamson Tobacco Co. (a subsidiary of the British-American Tobacco Co.) with headquarters in Louisville; employed by Axton-Fisher at time of his election as a director on September 5, 1941; elected Vice-President of Axton-Fisher July 31, 1943; served as Vice-President and a director until the dissolution of Axton-Fisher.

Holman Wilson—A stock and bond broker in Louisville for 18 years.

Menefee Wirgmann—President of Fidelity and Columbia Trust Company; also President of Citizens Union National Bank (both banks subsequently amalgamated or merged to form the Citizens Fidelity Bank & Trust Company).